**BRABAZON v. BELSHIPS CO., LIMITED, SKIBS A/S.**

No. 10822.

United States Court of Appeals
Third Circuit.

Argued Nov. 4, 1952.

Decided March 26, 1953.

Thomas E. Byrne, Jr., Philadelphia, Pa. (Joseph J. Murphy, Robert Cox, Krusen, Evans & Shaw, Philadelphia, Pa., on the brief), for appellant.

Milton M. Borowsky, Philadelphia, Pa. (Freedman, Landy & Lorry, Philadelphia, Pa., on the brief), for appellee.

Before MARIS, GOODRICH and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

During the loading and securing of a ponderous cargo of forty-eight locomotives and forty-eight tenders in the hold of a ship owned and operated by appellant Belships Co. Ltd., the appellee, Brabazon, working as an employee of Jarka Stevedoring Company, an independent contractor engaged by Belships for this operation, fell and suffered serious injuries. The accident occurred while the ship was docked in navigable water in the port of Philadelphia. Brabazon sued Belships in admiralty for maritime tort and recovered. The ship-owner has appealed. We have to determine whether the record shows any actionable wrong of Belships to which Brabazon's injury can properly be attributed.

At the time of the accident, rows of locomotives had already been loaded so as to fill the lower part of the hold. Beams and frames had then been installed at a level some six feet above the tops of the locomotives, and tenders loaded on these. Brabazon was a member of the lashing gang working at night to secure the tenders. Desiring a tool from the bottom of the hold at a point some distance away, Brabazon left the place on the port side where his gang was lashing a tender to go to the starboard side and thence down to the bottom of the hold. Earlier movements that night by him and his gang between different levels had all been on the port side where they were working. But on this occasion Brabazon walked from port to starboard, across the tops of the locomotive cabs. Moving thus athwartship and in semi-darkness he came to a gap of some three or four feet between the roofs of the cabs of two locomotives standing side by side. Bridging this gap were two boards. He walked on them. One board broke under his weight and he fell some twenty feet to the bottom of the hold sustaining the injuries in suit.

Concerning the character and history of the board which broke the evidence shows only that it was about 8 feet long, 7½ inches wide and ¾ of an inch thick, too thin to safely bear the weight of a man when used to bridge a four foot gap; that it was not placed across the locomotive cabs by Brabazon or any member of his particular gang, who had come to work less than two hours before the accident; and that it was not a piece of lumber which had been supplied by Belships.

More generally, during the period in question, Belships retained possession and control of the vessel as a whole. However, the activities in progress in the hold, the placement and securing of the cargo, were being accomplished under contracts with Belships by two independent corporations, Jarka Stevedoring Company, and Haenn Ship Ceiling and Refitting Corporation. The lashing work was being done by Jarka gangs under the immediate and continuing control and direction of their own foreman. However, through the ship's officers who retained their normal shipboard authority and responsibility, Belships exercised general supervision over the placement and attachment of the cargo.

At the outset it is to be noted that this case is distinguishable on its facts from those which impose liability upon a shipowner, whether on the basis of negligence or unseaworthiness, for consequences which flow from defects or dangerous conditions already existing on its ship when an independent contractor and his employees have come on board. Hawn v. Pope & Talbot, Inc., 3 Cir., 1952, 198 F.2d 800; Lauro v. United States, 2 Cir., 1947, 162 F.2d 32; Munson S. S. Lines v. Newman, 5 Cir., 1928, 24 F.2d 416; The Etna, D.C. E.D.Pa.1942, 43 F.Supp. 303. It is not suggested that the accident here resulted from anything that was wrong when the loading began. Moreover, the possibility of actionable wrong is further limited in this case by the admitted fact that Belships did not furnish anything defective to Brabazon or his employer. Specifically, Belships did not supply the board which broke. Indeed, there is no proof of any blameworthy affirmative action of Belships which can be charged as the responsible cause of the accident. Therefore, cases which impose liability on any such basis are not helpful here. E. g. McNeil v. United States, D.C. E.D.Pa.1950, 94 F.Supp. 303; Olszewski v. United Fruit Co., D.C.E.D.Pa.1940, 34 F. Supp. 113; The Dalhem, D.C.D.Mass.1941, 41 F.Supp. 718. If chargeable at all, Belships must be held for some omission during the loading operation.

■ . With the issue thus narrowed, appellant urges that, the hold having been safe when loading operations began, the shipowner thereafter has no affirmative responsibility whatever for shipboard hazards not of his own creation that may come into existence in the independent contractor's work area during the course of loading. We do not accept so sweeping a generalization. The owner who retains control of the vessel as a whole and general supervision of what is being accomplished by an independent contractor in one part of the vessel is not relieved of all responsibility in connection with the prevention, discovery or correction of new hazards which may make the area temporarily used and occupied by independent contractors an unsafe place to work. E. g. Anderson v. Lorentzen, 2 Cir., 1947, 160 F.2d 173; Fodera v. Booth American Shipping Corp., 2 Cir., 1947, 159 F.2d 795. At the same time, as this court has recently pointed out, the duty of a shipowner in any case to provide a safe place to work, unlike the distinct if sometimes overlapping duty to provide a seaworthy vessel and appurtenances, is not absolute. Rather it is a requirement of reasonable care under the circumstances. See Cookingham v. United States, 3 Cir., 1950, 184 F.2d 213. Cf. Baltimore & Ohio S. W. R. R. Co. v. Carroll, 1930, 280 U.S. 491, 496, 50 S.Ct. 182, 74 L.Ed. 566; Chicago & N. W. Ry. Co. v. Payne, 8 Cir., 1925, 8 F.2d 332, 334. In such cases as we are now considering, the nature of the work being done in the hold, the fact that it was being accomplished by responsible independent contractors whose employees were the only persons working in the hold, and the fact that the area was safe when that work began, all may have bearing upon the issue of what would constitute due care by the shipowner during the loading period. The stated factors may have lessened the need or occasion for further precautions in the view of a reasonable person in the shipowner's place. But this is a matter of appraisal of particular facts and their impact upon reasonable behavior. It involves no general rule of absolution from responsibility. It permits different conclusions as to liability on the basis of relatively small factual differences. Compare the recent

decisions of this court in Hawn v. Pope & Talbot, Inc., supra, and Lopez v. American-Hawaiian Steamship Co., 3 Cir., 1953, 201 F.2d 418.

Accordingly, we come to a consideration of the particular omissions by Belships as the loading progressed which are said to constitute negligent failure to do its part in making or keeping the working area safe. Specifically, it is said that the evidence establishes failure to supply enough heavy lumber for staging, failure to remove all thin and unserviceable lumber from the hold, failure to inspect and discover the hazardous bridging board, and failure to provide adequate lighting.

█ While it is agreed that the plank which broke was not lumber supplied by Belships, it is also clear that under its agreement with the contractors Jarka and Haenn, the shipowner undertook to supply suitable lumber which the contractors might use as needed for staging throughout the several weeks of the loading operation. A quantity of such lumber was supplied. There is conflicting evidence concerning the adequacy of the supply and the need from time to time for more staging lumber. But there is nothing to show that whoever laid the thin plank between the locomotives could not at that time, whenever it may have been, have as readily procured a board of suitable thickness. Nor is there anything to show that at the time of the accident there was no suitable lumber at hand for Brabazon to use if he had discovered the need. To the contrary, the evidence affirmatively showed and the District Court found that when Brabazon and his gang began work on the night of the accident there were at hand loose boards of "varied sizes in length, breadth and thickness. Some were lengths of staging lumber, others sweat boards * * *, others an in-between size". [103 F.Supp. 594.] There is nothing to show that had Brabazon realized the inadequacy of the particular plank he would have been unable conveniently to replace it with suitable lumber of the stock furnished by Belships. Finally, on this phase of the matter, Brabazon makes the point that there were miscellaneous boards varying in size and thickness lying around in the hold. From this fact it is argued that Belships was negligent in not removing the thin lumber out of reach of the workmen. To us this argument approaches the transferral of a doctrine of attractive nuisance from children to seamen. With all reasonable solicitude for the welfare for those who work on the sea and its margins, we think it is going too far to say that a shipowner is negligent for leaving both light and heavy lumber within the reach of stevedores because one of them might mistakenly use the light for purposes for which it should be plain that only the heavy is adapted.

█ A separate argument is made that a reasonable inspection by the ship would have disclosed the plank which constituted an unsafe bridge before the accident. There is the obvious initial difficulty that we can not determine how long the plank had been there. Cf. Shannon v. United Barge Line Corp., 3 Cir., 1952, 194 F.2d 584; Cookingham v. United States, supra; Guerrini v. United States, 2 Cir., 1948, 167 F.2d 352; Boyce v. Seas Shipping Co., 2 Cir., 1945, 152 F.2d 658. At most the evidence indicates that no one in Brabazon's gang put it there and thus that it may well have been there two or more hours. Beyond this, the area was not in general use. We are not dealing with conditions created in a public or even a normal passageway. Contrast Santamaria v. Lamport & Holt Line, Ltd., 1938, 119 N.J.L. 467, 196 A. 706. We are not dealing with a fabricated scaffolding or any specialized structure the existence or location of which, much less the need for inspection, should have been known or anticipated. Contrast McNeil v. United States, supra. We are dealing with the most transitory placement and replacement of planks as needed in the course of work to bridge gaps across the air space between pieces of cargo as men moved from place to place securing the cargo. We can see no greater basis for duty of the shipowner to look for and promptly discover a misplaced board in such a situation than to check after, or even during, each shift to see whether workmen of an independent contractor may have left a loose tool or a spot of grease on the top of some cargo

where a workman of the same or a later shift may step and lose his footing. A practical view of the operation and responsibility of the independent contractor and his employees should influence judgment of what affirmative precautionary measures the shipowner can reasonably be expected to take in each set of circumstances to safeguard the contract operation and its immediate environment as work progresses. We think the requirements the appellee would impose in this case are patently unreasonable.

Without adverting to these difficulties, the District Court found in rather general terms that the defendant was derelict in failure to perform its nondelegable duty "to furnish libellant with a safe place to work". Apparently the provision of a "safe place to work" was viewed as an absolute requirement rather than a rule of reason. Inflexible statements of the duty do appear from time to time in judicial opinions, but we think such statements are misleading and should be disregarded. As we already have pointed out, each case requires a separate determination whether the particular conduct of the shipowner fell short of reasonable care in the given circumstances.

█ In addition the District Court apparently viewed the disastrous plank as an "appurtenance" of the ship. Thus, while using the language of safe place to work, the court may have applied the reasoning which imposes liability without proof of negligence where damage is viewed as done by the ship itself through some defective condition of its appurtenant gear or appliances. This, of course, is the conception of liability predicated upon "unseaworthiness". Mahnich v. Southern Steamship Co., 1944, 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561; Read v. United States, 3 Cir., 201 F.2d 758; Munson S. S. Lines v. Newman, 5 Cir., 1928, 24 F.2d 416. Certainly the use of words like "walkway", "platform", and "scaffolding" in testimony and in argument in this case tended to suggest such a conception. But we think no phraseology should be permitted to obscure the fact that we are considering no more than a loose board which was neither sup-

plied by the ship nor incorporated into any structure of the ship, but rather came from an unidentified source and was laid across and between two pieces of cargo by an unidentified person. The unknown source of the board, its transitory placement and its lack of any characteristic adapting it for particular shipboard use or differentiating it from other miscellaneous lumber all combine to require the conclusion that the object was not an "appurtenance" of the ship as that term is used in connection with the shipowner's special responsibility for seaworthiness of ship's gear and appliances. With the object here, contrast the dunnage constituting ship's ceiling in McNeil v. United States, supra; the ship's improvised support for the boom in Neptune Steam Nav. Co. v. Borkmann, 4 Cir., 1902, 118 F. 420; the ship's unserviceable lighting fixtures in Read v. United States, supra.

But the case has yet another aspect. Does the lack of lighting at the place of the accident afford a basis for recovery? The record and the findings of fact suggest that lack of illumination was specially emphasized in the District Court as a factor relieving Brabazon of contributory negligence in failing to appreciate the inadequacy of the board, more than as an affirmative basis of responsibility. But the libellant pleaded failure to supply light as actionable negligence and several witnesses testified on the point. Moreover, in its conclusions of law the District Court said "The failure to provide proper and adequate staging, illumination, and warning * * * constituted negligence on the part of the * * * respondent, which was the proximate cause of the libellant's injuries". Accordingly, we examine the record to determine whether failure to provide illumination is a proper basis of liability in the circumstances of this case.

The number one hold where this accident occurred was a large area accommodating two rows of locomotives, one behind the other, and two rows of tenders on top of them. Some conception of its size can be obtained from the captain's testimony that "the number 1 hatch is seventy-six foot long and twenty-six foot wide, clear opening, * * * the biggest hatch opening I

ever seen on any ship". Work was being done by the independent contractor in this hold at night, and the responsibility undertaken by the ship was to furnish electricity and suitable and sufficient lighting sources and fixtures, which were appliances of the ship. Electricity was delivered through sockets along the coaming of the hatch. Each light fixture provided by the ship for use in this connection was a portable cluster at the end of an extension cord to enable attachment to a socket along the hatch coaming while the light itself was so placed in the hold as to serve the immediate area where illumination was desired. If the ship did not have an adequate supply of such appliances in proper working order, this deficiency might well constitute unseaworthiness. Cf. Read v. United States, supra. And omission to supply lights as requested by the contractor might well be actionable failure to make the place of working reasonably safe. The facts of the given case must determine whether there was negligence in this regard.

■ Here the evidence is that four lighting fixtures or clusters were supplied for the number one hold on the night in question. Each of the three gangs of workmen was supplied with one cluster of lights to illuminate its immediate work area. A fourth cluster was so placed as to illuminate a ladder used for descending from the deck into the hold. All of the rest of the hold was in darkness or "semi-darkness". There is evidence that the ship was requested from time to time and on the evening of the accident to supply additional lights, but did not do so. We think Brabazon carried his burden of proof as to this fact.

The record makes it abundantly clear that the single light cluster used by a gang did not and could not illuminate more than the small area where a particular lashing was being accomplished. The fixture had to be low and so directed as to provide clear illumination for the immediate operation. Thus, the cluster for Brabazon's gang was placed between forward and aft tenders on the port side of each row and directed to port as well as downward so the workmen could see the entire lashing cable being attached at one end to a port side tender and at the other end to permanent structures of the hull on port side. This cluster cast no useful light to starboard. In addition, there was evidence that shadows of tenders would severely limit the effective range of individual lights and create a special lighting problem as men moved about between these vehicles. Yet, except for these lights for individual gangs, no illumination was supplied for any area but the access ladder from the deck. There was no provision for lights which could be placed to illuminate other areas of likely movement. And the record shows that men doing this type of work required tools and lumber which were scattered about the hold.

The area where injury occurred was just such an area as in all probability would have been lighted if more fixtures had been provided. Between the forward row of tenders with its supporting structure and the after row and its supports was a space measuring ten or fifteen feet fore-and-aft, clear except for lashings connecting the forward to the after tenders, and each group to the sides of the ship. This space extended all the way across the ship. This was a normal area for casual movement. In it men stood on the locomotives or on planks laid on the locomotives, six feet below the tenders, while working on lashings attached to the lower parts of the tenders. Brabazon's gang was working within this area on the port side. A similar gang was working in about the same relative position to starboard. But, in the circumstances, their single light clusters did not relieve the semi-darkness of the intervening space. Yet, this darkened area was the only clear space near the center of the hold which could be used for movement between port and starboard at a level above the locomotives. It should have been illuminated and we find it a reasonable inference that this would have been done had the ship provided more lights as asked.

■ Finally, it is clear on the record that the inadequacy of the board which broke to support a man's weight would have been apparent but for the darkness. Light would have made the danger obvious and would have enabled the workman to avoid it. Accordingly, we conclude that the negli-

gent failure of the ship to supply needed lights was a responsible cause of Brabazon's injury and that the judgment of the District Court merits support on that basis.

The judgment will be affirmed.