**Edgar Allen WEST, Libellant,**

v.

**UNITED STATES of America, United States Department of Commerce, Maritime Administration, Respondents (Atlantic Port Contractors, Inc., Impleaded Respondent).**

**No. 419 of 1952.**

United States District Court
E. D. Pennsylvania.

Aug. 2, 1956.

474

Freedman, Landy & Lorry, Philadelphia, Pa., for libellant.

W. Wilson White, U. S. Atty., Arthur R. Littleton, Asst. U. S. Atty., Philadelphia, Pa., Carl C. Davis, Asst. Chief, Admiralty & Shipping Section, Department of Justice, Washington, D. C., George H. Jaffin, Atty., Admiralty & Shipping Section, Department of Justice, Washington, D. C., of counsel, for respondent.

T. F. Edwards, George W. Hoft, Philadelphia, Pa., for respondent-impleaded.

CLARY, District Judge.

This action was instituted by libellant, Edgar Allen West, against the United States of America to recover damages for injuries sustained aboard the S. S. Mary Austin, a Liberty Ship owned by the respondent, United States of America. The United States impleaded the libellant's employer, Atlantic Port Contractors, Inc. A trial was held before the Court, sitting without a jury, on February 13 and 14, 1956. Proposed Findings of Fact and Conclusions of Law, and briefs in support thereof, having been submitted by all of the parties, the Court makes the following

### Findings of Fact

1. At all times material to this action, the S. S. Mary Austin, a Liberty Ship,

was owned by the respondent, United States of America, and was operated for the account of the respondent by United States Lines Co., under a General Agency Agreement, as a merchant vessel, under circumstances detailed hereafter.

2. Libellant, Edgar Allen West, also known as Eugene Albert West, was injured on November 21, 1951, while working in the engine room of the S. S. Mary Austin, in the capacity of marine engineer for the Atlantic Port Contractors, Inc. He was 66 years of age at the time of the accident.

3. From on or about November 5, 1951, to December 11, 1951, Atlantic Port Contractors, Inc. (hereinafter called "Atlantic"), a ship repair corporation, was engaged in the performance of certain repairs on the S. S. Mary Austin, pursuant to a contract between the United States and Atlantic.

4. Sometime after World War II the S. S. Mary Austin, like many of her sister Liberty Ships, was placed in the so-called "Moth Ball Fleet"; the ship was completely deactivated. As an essential part of the deactivation process all water pipes, boilers and tanks were drained and a special oil preservative was run through the system to prevent it from rusting; thereafter oil preservative was again run through the pipes, boilers and tanks from time to time, and each time the system was completely drained and left empty. When the S. S. Mary Austin was ordered reactivated, Government employees surveyed the vessel and prepared specifications of items requiring reconditioning, repair, or replacement. Bidders also made preliminary inspections and surveys and then submitted bids. On February 5, 1951, Atlantic was awarded the contract to do the necessary work for reactivating the S. S. Mary Austin according to specifications.

5. Under the terms of the repair contract, Atlantic was to completely overhaul the vessel; the specifications included cleaning and repairing all water lines, replacement of all defective or missing plugs and other parts, and the testing of all lines before closing and placing

them in active operating condition. The contract provided that the vessel be delivered into the possession of Atlantic, which was to have complete responsibility as to the manner in which the work was to be done during the progress of the work. After completion of repairs and final approval the vessel was to be redelivered to the United States. In order to insure compliance with specifications, the right to inspect all work and material prior to final acceptance was reserved to the United States. The right reserved was a bare right to inspect; all control; and, as above mentioned, responsibility was with Atlantic. Also, by the terms of the contract, Atlantic agreed to provide a safe place to work for its own employees, and, in addition, to indemnify the United States against any liability for personal injuries resulting from "the fault, negligence, wrongful acts or omissions" of Atlantic.

6. The S. S. Mary Austin was towed to Pier 5, North, Philadelphia, Pennsylvania, on November 5, 1951, where it was delivered to Atlantic in accordance with the terms of the contract. Two days later, on November 7, 1951, the vessel was shifted to Pier 9, North, Philadelphia, where she remained until completion of the repair work; she left Pier 9 on December 11, 1951, under her own power. The record does not establish the exact time that Atlantic started work on the vessel, but, from the record, there can be no doubt that the manner and progress of the repairs were under the complete control of Atlantic from November 5, 1951, to December 11, 1951, when the repair work was completed.

7. The United States Lines Co. assigned one of its marine engineers, Thomas Cameron, as Port Engineer to the S. S. Mary Austin. It was Mr. Cameron's responsibility to see to it that all work in connection with the reactivation was accomplished according to specifications and that a safely operating vessel was redelivered to the United States. His mode of operation was to inspect and test each item of the specifications as it was completed by the contractor.

The United States Lines Co. also had six other persons assigned to the vessel: T. G. Karso, Master; A. A. Haus, Chief Officer; Jerome L. Greenberg, Second Officer; Arthur O'Conner, Chief Engineer; Charles Booth, First Engineer, and Jose Salguero, Chief Steward. These men were the officers, as designated, who sailed with the vessel on her first voyage after her reactivation. At the time of the accident, however, and at all times during the repairs, they had not signed Articles; they were merely on the United States Lines Co. weekly payroll. These six men performed some of the duties of a regular crew, but they did not have control of the repair work, the manner in which it was performed, or the rate at which it progressed, and they did not have control of the ship in the ordinarily accepted context. Their chief function was to assist Mr. Cameron in inspecting the various items of work as completed and to help him discharge his duties efficiently. They were under Mr. Cameron's jurisdiction and had no independent right to grant approval of any job other than that which they derived through him. All had specific instructions not to interfere with the work or manner of work of Atlantic's employees. They were to do no more than carry out routine inspections and watch the work as it progressed. If they saw a man performing a task in an unsatisfactory manner they were not to and actually did not correct the situation themselves but rather reported their complaints to Atlantic supervisors, who in turn had the situation corrected. The record establishes to the satisfaction of the Court that Mr. Cameron and all his subordinates conformed to this practice.

8. The libellant was injured at about 11 A.M. on the morning of November 21, 1951, while he was working inside the low pressure cylinder of the main engine. He was kneeling on his right knee when a one inch pipe plug struck his left knee. At the time libellant believed that the plug, which weighed about a quarter of a pound, had been dropped by one of his fellow workers while working above him in the engine room and, although he now denies it, the Court believes that at the time he accused a number of persons of having dropped the plug. The record fails to establish that any group or individual was working above libellant at the time. Although the plug was not produced at the time of trial and the explanation of its absence is not satisfactory (libellant merely claimed he could not find it), the record leaves no doubt that a plug did strike the libellant's left knee and that (1) it either fell from one of the pipes or tanks above the low pressure cylinder in which libellant was working, or (2) was dropped by an Atlantic workman. The presence of a small quantity of water on the engine room floor immediately after the accident would indicate the probability of the first conjecture.

9. The libellant was helped out of the engine room, off the vessel and onto the deck. He was then taken to Dr. L. J. Farmakis who aspirated 20 cc of fluid from the prepatellar bursa, wrapped the knee with an elastic bandage and arranged for X-rays. The X-rays were taken at Jefferson Hospital on November 24, 1951 and proved negative for fracture. Dr. Farmakis again saw and treated libellant on November 23, 26, 27, 28, 30 and December 3, when he referred him to Dr. Theodore E. Orr at the Travelers Insurance Company Clinic. Dr. Orr saw and treated the libellant a total of 13 times from December 4, 1951, to July 21, 1952. In addition, all during this period of time the libellant visited Travelers' Clinic an average of three times a week for physiotherapy treatments. On July 21, at the time of libellant's last visit to the clinic, Dr. Orr was of the opinion that further physical therapy treatments would not bring about any further improvements and discharged the libellant as ready to return to work.

10. At the time of trial libellant testified to injury not only to his knee but also to his stomach. The record clearly establishes that all prior complaints and treatments were for a knee injury only

and there is no basis for the now claimed stomach injury.

11. At the time of his discharge by Dr. Orr in July, 1952, libellant had a free, nonpainful range of motion from 180 degrees, in a straight line, to 80 degrees. There was no swelling, no evidence of crepitation, nor was there evidence of instability of the knee. Libellant complained of pain when he used his leg but this Dr. Orr attributed to atrophy of the quadriceps muscle, which condition resulted from nonuse of the leg and which would be corrected after the libellant again started to use his leg. While libellant now has a slight narrowing of the joint space in the knee, the cause lies in his advanced age rather than trauma. The Court is satisfied that whatever discomfort libellant may have suffered after July, 1952, it was of no greater degree than that which he suffered before his injury on November 21, 1951. Libellant claimed at trial that he had never had any trouble with his leg prior to the time the plug struck his knee. The number of witnesses who testified that they had seen him limping for some time prior to the accident, that libellant had complained about the trouble he was having with his knee, and the fact that he was specifically given the job of working in the low pressure cylinder so that he would not have to climb convinces the Court that a painful knee condition existed prior to the time of the accident. Whatever discomfort libellant suffered after July, 1952, was due to the pre-existing conditions and not the accident.

12. Soon after he was discharged as capable of resuming work, libellant, in August, 1952, received a medical examination prior to starting work for Todd Shipyards. Said examination revealed no knee condition whatsoever and libellant, being otherwise fit, immediately started work as a boilermaker at Todd's. His job included climbing ladders and scaffolds and there was no indication of any trouble with his knee; the record establishes that libellant carried a normal working load and performed his work in a normal and entirely satisfactory manner. Libellant worked regularly at Todd Shipyards until he was injured in a fall from a scaffold. From July to November, 1953, libellant worked as an inspector of freight elevator doors for Guilbert Company. Although he was discharged from Guilbert's his employment was not terminated because of any physical condition. This subsequent work record clearly supports the opinion of Dr. Orr that libellant's knee injury was not permanent in nature nor did it limit him to sedentary work. After July, 1952, libellant's injury of November 21, 1951, did not impair his earning capacity.

13. At the time of his injury libellant had a potential earning capacity of about $6,000 a year. His work record was very irregular however and no satisfactory record of previous earnings was introduced into evidence.

14. Respondent was not guilty of negligence.

15. The S. S. Mary Austin was in reasonably satisfactory condition for reactivation purposes and to that extent was not unseaworthy.

16. No unseaworthy condition of the S. S. Mary Austin contributed to libellant's injury.

17. Libellant's total damages, including loss of wages, pain, suffering and inconvenience, are $5,000.

### Discussion

The libel in this action charges that libellant was injured solely by virtue of the negligence of the respondent and the unseaworthiness of the S. S. Mary Austin; and, further, that the respondent was negligent and the vessel unseaworthy in failing to provide libellant with a reasonably safe place to work, failing to provide, install and maintain the water line and plug in a safe and operating condition, failing to inspect and discover the unsafe condition and failing to warn libellant of the unsafe condition. The Answer denies that respondent was negligent or the vessel unseaworthy; it further alleges that the libellant himself

was negligent and that he assumed the risk of his employment, and, as a separate defense, the Answer alleges that any injury received by libellant was due solely to the negligence or fault of "persons other than the respondent". Simultaneously with the filing of its answer to the libel the respondent impleaded Atlantic, alleging that any injuries suffered by libellant were the result of the negligence or fault of Atlantic and that the United States is, in any event, entitled to indemnity for any damages collected against it by virtue of the terms of the contract between the United States and Atlantic.

The issues presented by this action can be divided into three phases, each lending itself to separate discussion. The first phase of this action goes to ununseaworthiness. Here we must determine whether a shipowner is liable for injuries caused by an unseaworthy condition to a shoreside repairman employed by a ship repair contractor when the cause of the injury was a condition which the contractor was required to inspect, repair and test to make sure that it was seaworthy. Then, we must determine if, under the circumstances, the S. S. Mary Austin was unseaworthy and, as a corollary, whether the injury was caused by the unseaworthy condition. The second phase concerns negligence. Here we must determine whether the United States had a duty to provide libellant with a safe place to work, whether it failed in that duty and whether the injuries were caused because of the United States' failure to discharge that duty. The last phase arises only if there is liability on the part of the respondent, for if libellant recovers any damages we must then determine whether under the terms of the contract between the United States and Atlantic, the United States is entitled to recover against Atlantic by way of indemnity.

### Seaworthiness

█ The leading case on the question of whether a longshoreman may recover for injuries sustained while working aboard a ship due to an unseaworthy con-

dition is Seas Shipping Co., Inc., v. Sieracki, 1945, 328 U.S. 85, 66 S.Ct. 872, 879, 90 L.Ed. 1099. In that case a longshoreman was injured while loading a ship when a defective shackle supporting a loading boom broke causing the boom to fall on the longshoreman. The District Court found that the condition which caused the injury was due to a defect in the forging of the shackle and that the shipowner, having no obligation to test for such defects, was not negligent. The question therefore became whether the absolute duty to provide a seaworthy vessel, an obligation traditionally owed by the owner of a ship to seamen, extended to a stevedore injured while working aboard a ship. The Court held "that for injuries incurred while working on board the ship in navigable waters the stevedore is entitled to the seaman's traditional and statutory protections, regardless of the fact that he is employed immediately by another than the owner. For these purposes he is, in short, a seaman because he is doing a seaman's work and incurring a seaman's hazards". The Court noted that the task being performed by Sieracki, loading a ship, was one traditionally done by seamen and that the policy underlying a seaman's recovery should be continued despite present day practices of specialization and division of labor. The minority opinion took the position that the longshoreman was not subject to the conditions which entitled a seaman to indemnity for injuries attributable to unseaworthiness, namely, those of a ship's discipline and the hazards of the sea, and, further, that Congress had recognized this in its enactment of the Longshoreman's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq.

In Pope & Talbot, Inc., v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143, the Sieracki decision was used as the basis for extending a shipowner's warranty of seaworthiness to a shoreside carpenter making minor repairs on loading equipment of a ship. The relationship of the libellant's work to the loading of the ship provided the basis for recovery.

At page 413 of 346 U.S., at page 207 of 74 S.Ct., the Court said:

> "The ship on which Hawn was hurt was being loaded when the grain loading equipment developed a slight defect. Hawn was put to work on it so that the loading would go on at once. There he was hurt. His need for protection from unseaworthiness was neither more nor less than that of the stevedores then working with him on the ship or of the seamen who had been or were about to go on a voyage."

Mr. Justice Jackson, who did not participate in the Sieracki decision, thought the extension of the doctrine of unseaworthiness to a repairman to be completely "illogical" and this, for the same reasons advanced in the dissenting opinion of the Sieracki case.

Both the Sieracki and Hawn cases involved shoreside workers who had some contact with the ship's loading equipment. A close study of these cases shows that the basis of these decisions does not rest in the name given to the person doing the work—seaman, longshoreman or repairman—but rather the nature of the work in which he is engaged. Broadly stated, the principle of law laid down in the aforesaid cases is that if a person is engaged in the "service" of the ship, and the service is one traditionally performed by seamen, then the warranty of seaworthiness runs to that person. We need not decide whether, in this Circuit, the principle has been limited by Bruszewski v. Isthmian S. S. Co., 3 Cir., 1947, 163 F.2d 720, D.C.E.D.Pa.1945, 66 F.Supp. 210. In the instant case the libellant was engaged in major repairs to the boiler system of a ship which was being reactivated. The ship did not have a crew and it did not come from the sea seeking the services of specialists within the meaning of the Sieracki opinion. In Guerrini v. United States, 2 Cir., 1948, 167 F.2d 352, at page 354, conjecturing on the possible limits of the Sieracki doctrine, Circuit Judge Learned Hand said:

> "* * * everything done on board a ship contributes to her 'service,' if it helps to make and keep her ready for her work; and probably all but majoral structural repairs were, at least in early time and elsewhere than in the home port, often made by the crew."

This case presents about as close an approximation to home port structural repairs as analogy will allow. The work here being done was not of the type ordinarily performed by seamen and does not fall within the doctrine of the Sieracki and Hawn cases.

Except for the fact that the S. S. Mary Austin was afloat, this case parallels Desper v. Starved Rock Ferry Co., 1951, 342 U.S. 187, 72 S.Ct. 216, 218, 96 L.Ed. 205. There libellant's decedent was employed by the operator of a fleet of motorboats carrying sightseers during the summer months. After each season the boats were beached and put on blocks for the winter. At the time of the injury libellant's decedent was engaged in preparing the boats for navigation. In affirming the Court of Appeals' reversal of a Judgment for the libellant under the Jones Act, 46 U.S.C.A. §§ 688, the Court said: "The work in which the decedent was engaged at the time of his death quite clearly was not that usually done by a 'seaman.' The boats were not afloat and had neither captain nor crew. They were undergoing seasonal repairs, the work being of the kind that, in the case of larger vessels, would customarily be done by exclusively shore-based personnel." The fact that the S. S. Mary Austin was afloat is not controlling; although, it should be noted that she most certainly was in her then condition not a navigable vessel and, as stated by the Supreme Court in the Desper case, 342 U.S. at page 191, 72 S.Ct. at page 218:

> "It is our conclusion that while engaged in such seasonable repair work Desper was not a 'seaman' within the purview of the Jones Act. The distinct nature of the work is

emphasized by the fact that there was no vessel engaged in navigation at the time of the decedent's death."

It is the nature of the work being performed by the libellant which takes him out of the class of persons to whom the warranty of complete seaworthiness runs. For this reason, the fact that the libellant was working on the low pressure cylinder of the ship, a unit distinct and apart from the pipes and boiler in which the situation which caused the injury existed, is of no consequence. The entire reactivation processes were outside the scope of the Sieracki opinion and this being so, the United States, as owner of the S. S. Mary Austin, cannot be charged with having warranted to libellant a completely seaworthy vessel.

## Negligence

The United States concedes, as indeed it must, that it was under a duty to provide libellant with a safe place to work and that this duty was a nondelegable one. The question presented is the nature and extent of that duty. Unlike the distinct and sometime overlapping duty to provide a seaworthy vessel and appurtenances, a shipowner's duty to provide a safe place to work is not an absolute duty; rather, it is a requirement of reasonable care under the circumstances. Brabazon v. Belships Co., 3 Cir., 1953, 202 F.2d 904, 906. It is not a unique and separate ground of liability but rather liability predicated upon negligence. Cookingham v. United States, 3 Cir., 1950, 184 F.2d 213, see opinion of Chief Judge Kirkpatrick, D.C. E.Pa.1949, 87 F.Supp. 203, 205. Thus, an appraisal of the particular facts and their impact upon reasonable behavior becomes necessary. The S. S. Mary Austin was towed to Pier No. 5, North, Philadelphia, on November 5, 1951. Its water tanks and pipes were completely drained. Nothing in the condition of the vessel as it then stood could have caused the libellant's injury. It was only after something was done to alter the conditions of November 5, 1951, that made the area in which libellant worked a potentially unsafe place to work. That "something", of course, was the placing of water, and the pressure resulting therefrom, into the pipes and tanks. This was done not by the respondent but by the members of the reactivation crew, employees of Atlantic. That loosely fitted plugs might be present and not able to withstand the application of pressure is certainly not surprising. That very fact was one of the reasons that the ship was being repaired and whatever precautions should have been taken when water was first placed into the lines should have been taken by Atlantic. Respondent can be held liable for the actions of Atlantic's employees only if it had a right (and therefore the correlative duty) to control the acts of these men or did so in fact. I have already noted that the contract between the United States and Atlantic required the delivery of the S. S. Mary Austin to the possession of Atlantic and the right to control the manner in which the work was done was exclusively with Atlantic; the only right reserved to the United States was the right to inspect the work after its completion and either accept or reject it. The record presents contradictory testimony as to whether the employees of United States Lines Co. did in fact direct the men in their work and exercise control over the manner in which the work was being done. Questions of credibility are always troublesome. Based upon the entire record, the numerous inconsistencies in the libellant's testimony at the time of trial with either prior statements or existing facts, the interest of the witnesses as well as their manner and demeanor on the witness stand, the Court has found (Finding of Fact No. 7) that the respondent did not exercise any control over the employees of Atlantic. Rather they followed the pattern there outlined. Thus, there was no actionable wrong on the part of the United States in either the form of acts of commission or omission, before or after its delivery of the S. S. Mary Austin to Atlantic for

reactivation and it, therefore, is not guilty of negligence.

### Indemnity

 Decision of the remaining question as to the right of the United States over and against Atlantic is not really necessary in view of the conclusions set forth above. However, the Court has no hesitation in stating that, if its conclusions were otherwise and it had held that the facts of this case entitled libellant to a recovery under the Sieracki case, the United States would be entitled to judgment over and against Atlantic for the full amount of libellant's damages. The testimony as to the happening of the accident and the entire surrounding circumstances has convinced the Court that the primary fault for this occurrence rests with Atlantic. There were no plugs of the kind described located immediately above the point where libellant was working and pressure was required to cause the plug to fall in such a manner as to strike the libellant. The primary fault, therefore, can be ascribed to the conduct of Atlantic's employees. In that event, the accident having happened from the "fault, negligence, wrongful acts and omissions" of Atlantic, the United States would be entitled to full indemnity under the terms of the contract.

### Conclusions of Law

1. The Court has jurisdiction of the parties and the subject matter of this suit.

2. The respondent, United States of America, under the facts of this case did not owe the duty to provide a completely seaworthy vessel to the libellant, a shoreside worker engaged in the reactivation processes of the S. S. Mary Austin.

3. The "service" being rendered by the libellant aboard the S. S. Mary Austin was not one traditionally done by seamen.

4. The condition of the S. S. Mary Austin when delivered by the United States of America to Atlantic for reactivation purposes only did not constitute the S. S. Mary Austin an unseaworthy vessel.

5. The respondent's duty to provide libellant with a safe place to work is not an absolute duty, but rather a requirement of reasonable care under the circumstances.

6. The respondent did not breach its duty to provide libellant with a reasonably safe place to work.

7. The respondent is entitled to judgment in its favor.

An appropriate order will be entered.