**Wilbert ALLEN, Libelant,**

v.

**UNITED STATES of America, Respondent.**

**Keystone Drydock & Ship Repair Co., Inc., Respondent-Impleaded.**

**No. 241 of 1957.**

United States District Court
E. D. Pennsylvania.
July 1, 1959.

Bernard Sacks (of Dorfman, Pechner, Sacks & Dorfman), Philadelphia, Pa., for libelant.

Harold K. Wood, U. S. Atty., Philadelphia, Pa., for respondent. Carl C. Davis, Asst. Chief, Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., of counsel.

John B. Hannum, 3rd, Philadelphia, Pa., for respondent-impleaded.

LAYTON, District Judge.

This is an Admiralty proceeding brought on behalf of the libelant, Wilbert Allen, against the United States, as owner of the U.S.S. Casa Grande (LSD–13),[1] pursuant to the Public Vessels Act of 1925, 46 U.S.C.A. §§ 781–790. Allen, a shipyard welder, seeks to recover damages for injuries sustained in a fall while he was engaged in removing temporary staging in the forward ballast tank of the Casa Grande. The staging was erected in the tank by the contractor which had contracted to make extensive repairs and alterations to the vessel. Pursuant to Admiralty Rule 56, 28 U.S.C.A., the respondent, United States, impleaded the contractor, Keystone Drydock and Ship Repair Co., Inc., libelant's employer, asserting a right of indemnification over against the latter.

Allen charges that the Casa Grande was unseaworthy due to the defects in the staging which gave way while he was standing on it and, furthermore, that the government was negligent in failing to furnish him with a reasonably safe place to work.

Whether or not the Casa Grande was seaworthy in large part depends upon Allen's status while working about her which, in turn, depends upon the nature of the repairs. Accordingly, a rather detailed statement as to the nature, extent and cost of the overhaul is required.

Prior to June 7, 1956, the LSD-type vessel was found to be well adapted to the work of Arctic Base Supply except for the fact that the hull was not of sufficient strength to navigate in ice condi-

1. Landing Ship Drydock.

tions. Moreover, the Casa Grande was then in need of an extensive overhaul and, in addition, a request had been made to the Bureau of Ships for certain alterations, the most substantial of which were (a) the stiffening of the entire hull just mentioned and (b) the removal of the mast for the installation of extensive new radar equipment.

On June 7, 1956, while en route from Sonerestrom to Goose Bay, Labrador, the Casa Grande was struck by an iceberg causing such extensive damage to the hull as to compel her immediate return to the United States. So serious was the hull damage that her captain refused to take on a return cargo of floating barges. Temporary emergency repairs were effected which enabled her to limp back to Norfolk where she was ordered to Philadelphia for the overhaul, repairs and alterations previously mentioned as well as the repairs to the hull. At Fort Mifflin, all ammunition was unloaded. At the Sun Shipbuilding Co., she was drydocked to ascertain the exact nature of the damage to the hull. This was found to be a hole 20 feet high and 40 feet long together with extensive cracks in the hull. The hole itself was like a "rolled up sardine can". While at the Sun Drydock, the propellers [2] were removed. She remained there until the bid for repairs and alterations was awarded to Keystone and then she was towed by Navy tug to a point near the Keystone yard where she was placed under tow by a civilian tug under the direction of a civilian pilot, taken into the custody of, and berthed by, Keystone at its dock.

### The Overhaul

The work on the radar mast was both extensive and costly. The mast had to be unstepped, hoisted onto the dock by crane and transferred to the yard. After the new equipment was installed, the mast had to be restepped.

The work of stiffening the entire hull, exclusive of repairs to the hull, was substantial also. Heavy steel strengthening members were inserted and welded in place around the entire hull and a large bulkhead was installed in the forepeak tank. The designs for these alterations were apparently prepared by the Bureau of Ships in accordance with drawings and blueprints made up by Naval architects. It appears also that the services of a shipyard were needed in fabricating the plates which comprised the bulkhead some of which were so large (3 feet x 8 feet) as to necessitate cutting a hole in the deck in order that they could be lowered into the forepeak tank. The hull stiffening job alone required the services of about 45 men for a substantial portion of the time the ship was at Keystone.

Aside from the alterations to the radar mast and the strengthening of the hull, numerous major and minor repairs were made. The ship's starboard turbine had to be completely removed and trucked back to the manufacturer. The task of transferring the turbine from the ship onto a truck was substantial in itself, involving, as it did, the removal of a good deal of wooden and steel decking and the assistance of a shipyard crane. Both boilers had to be torn down and completely rebricked. The steering mechanism was entirely overhauled. The ship's ballasting system, vitally important to the functioning of a Landing Ship Drydock, was found to be in an unusually bad condition due to extensive rust, requiring the removal of much rusted pipe, some as large as 6 inches in diameter, together with the installation of new pumps. This job alone took two weeks. In addition, certain new type pumps were installed in other parts of the ship to replace existing pumps and new propellers had to be installed. Some steel decking (not the decking torn out to

2. These were ice propellers of special alloy, designed to operate in Arctic waters. Bronze propellers would be chewed to pieces in short order under icy conditions. These propellers were installed on another LSD and thus the Casa Grande could not again return to the Arctic without being supplied with special propellers.

remove the turbine) was removed and replaced and over 4,000 feet of new wooden decking was installed. There were repairs to the radio. The two boiler room blowers were removed and ice damage to the bow (exclusive of hull damage) was repaired.

In addition to all this was the substantial job of fabricating plates and welding for the repair of the 800 square foot hole in the hull.

In summation, the repairs, alterations and overhaul took in excess of 2½ months. During 1½ months of that period, the Casa Grande was drydocked. The services of 275 Keystone employes were required, and even aside from the very costly equipment on the radar mast, the job cost $700,000. Including this radar equipment, which the government itself supplied, it may be assumed that the over-all job cost nearly $1,000,000.

### The Law

■ It has long been settled that a shipowner is liable to indemnity for injuries to seamen as the result of unseaworthiness of the ship. Mahnich v. Southern Steamship Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561; The Osceola, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760. This indemnity, however, extends only to those who are performing work on vessels in navigation and work which is historically and traditionally performed by seamen. United New York and New Jersey Pilots Ass'n v. Halecki, 358 U.S. 613, 79 S.Ct. 517, 3 L.Ed.2d 541; Desper

v. Starved Rock Ferry Co., 342 U.S. 187, 72 S.Ct. 216, 96 L.Ed. 205. Whether or not Casa Grande, badly holed, minus most of her propulsion units such as propellers and one turbine, her boilers in very bad condition, her vital ballasting system partially nonoperational due to rust, and facing a 2½ month lay-up including a long period in drydock to effect these and numerous other repairs, could by any stretch of the imagination be considered in navigation is, at least, doubtful.[3]

### Traditional Ship's Work

■ Completely aside from this, however, it is my judgment that the work being performed by Allen was not traditionally seamen's work within the meaning of Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, and Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143, which extended the warranty of seaworthiness even to shoreside workers provided they were performing the type of work upon the vessel traditionally done by seamen.[4]

Even conceding, arguendo, that most repair work constitutes ship's work,[5] Allen was injured on an aspect of this job which, as I view it, cannot be characterized as part of repairs or of an overhaul. The hull of a Landing Ship Drydock could not withstand the pressures of operating in Arctic waters. Yet the ship generally was found ideal for supplying Arctic bases. To render it fit

---

3. Conceding that the crew (subject to 50% rotating leave) slept aboard, she was nevertheless in the general custody of Keystone subject only to the right of inspection by the government. Compare Union Carbide Corp. v. Goett, 4 Cir., 256 F.2d 449 and Raidy v. United States, D.C., 153 F.Supp. 777, affirmed 4 Cir., 252 F.2d 117.

4. Following the cited opinions, judges speculated whether, in effect, the warranty of seaworthiness had been opened wide to almost any type of work being performed by a shoreside worker on a vessel. Compare Judge Hand's opinion in Guerrini v. United States, 2 Cir., 167 F.2d 352, 354. But Halecki, following the

well-considered dissent of Judge Lumbard, Halecki v. United New York and New Jersey Sandy Hook Pilots Ass'n, 2 Cir., 251 F.2d 708, 713, sharply pointed out that the line of demarkation depended upon whether or not the type of work being done was historically and traditionally seamen's work.

5. Berryhill v. Pacific Far East Line, 9 Cir., 1956, 238 F.2d 385, and Raidy v. United States, above cited, do not go so far. These two cases may be interpreted as holding that major repairs are not a part of traditional ship's work. But see Judge Hand's statement in Guerrini v. United States, supra.

for such service, the hull had to be considerably strengthened. Such a job demanded something more than mere workmen, tools and materials. It obviously required the study of skilled experts and the reduction of their conclusions to blueprints and drawings. By the admission of Commander Walker, no one aboard the Casa Grande was capable of such a task. Certainly it is in evidence that Keystone was doing this particular work in accordance with blueprints and drawings furnished from some source. By the clearest inference, this was the work of Naval architects. And judging from the testimony of Di Carlontonio and Mahler, the Keystone foremen who directed this job, even when this was done, the practical work of interpreting the plans, fabricating plates and laying out and administering such a job was probably beyond the capabilities of the engineering department of a relatively small ship such as Casa Grande. Certainly, Commander Walker admitted that he was not certain that his engineering department was capable of doing the job. Again, while the engineering department of Casa Grande included welders, there is a rather clear inference from the testimony that these men were not expert and could be relied on only for the more simple phases of welding.

All in all, this was no repair job. Neither was it part of any normal overhaul. In effect, Casa Grande was being converted for use in Arctic waters. This was a hull alteration of some substance. So viewed, the case falls more logically within the rationale of Raidy v. United States, and Berge v. National Bulk Carriers, Inc., D.C., 148 F.Supp. 608, affirmed in 2 Cir., 251 F.2d 717, where the warranty of seaworthiness was denied upon the ground that the libelant was not engaged in traditional seamen's work at the time of injury. Compare the well-considered opinion of Judge Clary in West v. United States, D.C., 143 F.Supp. 473, affirmed 3 Cir., 256 F.2d 671.

Perhaps the closest analogy is Berge, supra [148 F.Supp. 610], where Judge Murphy said this:

"Applying the standard suggested by Sieracki and Pope & Talbot, Inc. v. Hawn to the present case, it is obvious that the nature of Mr. Berge's employment makes his case easily distinguishable from those on which he relies. The cases of Berryhill v. Pacific Far East Line, 9 Cir., 1956, 238 F.2d 385 and West v. United States, D.C.E.D.Pa.1956, 143 F.Supp. 473, the facts in which are almost identical to those in the case at bar, are more clearly analogous. Both cases in denying recovery stressed, as indeed the Supreme Court did, that the warranty of seaworthiness was extended to workmen other than seamen in the traditional sense of the word, because they were 'doing a seaman's work and incurring a seaman's hazards.' Seas Shipping Co. v. Sieracki, supra, 328 U.S. at page 99, 66 S.Ct. at page 880.

"The test then is not the name given to plaintiff's calling or trade but the nature of his work, and viewed in this light it is abundantly clear that plaintiff was not performing usual seaman's work. Granting that seamen have historically been required to perform some repair work both at sea and in port, nevertheless, they have never traditionally been required to remove, renew and reinstall transverse and longitudinal bulkheads—work which amounts to a virtual rebuilding of the interior of the vessel. Since the whole rationale of Sieracki rests on the premise that a shipowner cannot escape its absolute obligation to provide a seaworthy vessel by contracting to have a third party perform the services traditionally performed by seamen, it becomes apparent that once the third party performs services different from those usually performed by seamen, the warranty of seaworthiness which was historically designed to protect seamen, need no longer apply. Cessante rationale

legis, cessat et ipsa lex. Consequently the complaint is dismissed."

The fact that in a number of the cited cases, including Berge, the crew had been dismissed seems to be of little consequence, for in Halecki, the crew was on board five days weekly doing maintenance work. Concededly, the extent of the conversion jobs in Berryhill and Berge was greater than here, but the extent of the job is not necessarily controlling. In Halecki, the libelant died as the result of doing relatively minor repairs involving one Saturday morning's work. The important thing is that the nature of the work in which Allen was engaged was neither repairs nor overhaul. It was something distinct and different from ordinary seamen's work. Nor because Allen's particular job, welding, was something capable of being done by the crew, does this change the basic fact that in the broad sense he was engaged in work, i. e., converting the ship's hull to Arctic uses, which is not historically seamen's work. Compare Berge v. National Bulk Carriers, Inc., supra.

Not being engaged in ship's work, Allen is not entitled to indemnity for unseaworthiness.

### Negligence

■ In any event, Allen takes the position that the United States is liable for his injuries upon the principles of negligence. Thus, he asserts that the government was under a non-delegable duty to furnish him a safe place to work. In just such a situation, Judge Clary stated in West [143 F.Supp. 480]:

"A shipowner's duty to provide a safe place to work is not an absolute duty; rather, it is a requirement of reasonable care under the circumstances."

But I am not able to understand in just what manner the negligence of the respondent is supposed to have caused the accident. When Casa Grande was taken over by tugs and berthed at Keystone's dock, she came, for all practical purposes, into the temporary custody of Keystone, an independent contractor. Concededly, part of her crew slept aboard, apparently doing some form of maintenance work, but the fact remains she was in Keystone's custody [6] for a series of major repairs and alterations to last nearly three months and was drydocked over half that period. The work was all done by Keystone employees under direction of Keystone personnel. There is no testimony that the officers of Casa Grande had any control whatsoever over the work. The only right of control was that inherent in the government's daily right of inspection by Navy inspectors.

■ Granted that the government was liable for something more than the negligence of the master. It was also bound to anticipate dangers to shoreside personnel inherent in the overhaul and alterations despite the fact that an independent contractor was doing the work. Halecki v. United New York and New Jersey Sandy Hook Pilots Ass'n, 2 Cir., 251 F.2d 708. But unlike Halecki, what was the dangerous situation which should have been anticipated insofar as concerns this accident? When Casa Grande was berthed at the Keystone dock, there was nothing about the forepeak tank, nor in the nature of the alterations to be made therein, which were inherently dangerous so long as done properly. True, welding had to be done by standing on scaffolding and the scaffolding had to be carefully erected. But we have not yet gone so far as to burden the already overburdened shipowner with liability for failing to anticipate negligence on the part of employees of an independent contractor. The negligence, if any, was created by careless

---

**6.** "The government shall deliver the vessel described in the job order at such time and to such location as may be specified in the job order for the performance of the work, and upon completion of the work, *the government shall accept delivery of the vessel at such time and location as may be specified in the job order.*" (My emphasis). Clause 4 of Contract between Keystone and United States.

welding by Keystone workers of the supports for the scaffolding which broke, causing Allen's fall. In such circumstances, as Judge Clary aptly said in West:

"The S.S. Mary Austin was towed to Pier No. 5, North, Philadelphia, on Nov. 5, 1951. Its water tanks and pipes were completely drained. Nothing in the condition of the vessel as it then stood could have caused the libellant's injury. It was only after something was done to alter the conditions of Nov. 5, 1951, that made the area in which libellant worked a potentially unsafe place to work. That 'something', of course, was the placing of water, and the pressure resulting therefrom, into the pipes and tanks. *This was done not by the respondent but by members of the reactivation crew, employees of Atlantic.*" (My emphasis.)

The only possible argument available to Allen is that the Navy inspectors [7] should have discovered the improper welding of the supports. Assuming, arguendo, that this faulty welding was capable of being discovered by one looking for such a thing, the fact is that the Naval inspectors' primary job was to inspect the actual work in progress to determine whether it was proceeding according to specifications, not to make minute examinations into the means by which the independent contractor was carrying on its work. The defective supports were no part of the work. They were to be removed after the work, which it was the inspectors' duty to ex-

amine, had been approved. In fact, it was during the course of the removal or "burning off" of these supports that the alleged defective support gave way. While there was testimony that an expert welder may have known upon inspection that this weld was defective because of the presence of "grapes", yet the record is entirely devoid of any testimony tending to show that the defective welding in question was in such a position that it could have been reasonably discovered. Moreover, there is no testimony that an ordinary Naval inspector, even though he had seen the defective weld, was required to be so skilled in the art of welding as to have known that it was defective. Nor, unlike Palazzolo v. Pan Atlantic S.S. Corp., D.C., 111 F.Supp. 505,[8] was there testimony that in conversion jobs of this sort it is customary for ship's officers to inspect the staging erected by an independent contractor. What would be the result if it were a fact that the defect causing the injuries was so glaringly patent that the inspectors should almost certainly have discovered it [9] as an incident to their primary duties of inspection is not necessary here to decide because the fact is that this defective welding was of a support for planks 15 feet or so above the bottom of the forepeak tank and, of course, was to a certain extent hidden by the plank on which it was laid.

Inasmuch as the defect causing the injury could not have been reasonably anticipated and was neither a part of the work subject to inspection nor so obvious that it should reasonably have been

7. As far as can be ascertained, no representative of the government, officer or crew, except the Navy inspectors, had any occasion to be in the forepeak tank while the work in which Allen was engaged was going on.

8. Allen seems to rely on this as well as a number of other stevedoring cases such as Brabazon v. Belships Co., 3 Cir., 202 F.2d 904, but the loading of cargo has traditionally required the supervision of ship's officers while the work in suit was not of this sort. Moreover, Allen's re-

liance on the case of Read v. United States, 3 Cir., 201 F.2d 758, is unjustified because, there, the vessel was found to have been unseaworthy because defective lights were furnished by the ship to the independent contractor.

9. For instance, if the plank itself wobbled badly thus causing the fall, then the inspectors themselves would have been bound to discover the fact while walking over the same plank during their course of inspection.

discovered by the inspectors in any event, I find no negligence on the part of the respondent, United States, upon which liability can be grounded. West v. United States, 3 Cir., 256 F.2d 671; II Restatement of the Law, Torts, § 426.

█ There remains, then, to be disposed of Allen's argument that the government was negligent because the defective welding was done by Navy personnel. This contention is without merit but requires some examination into the facts.

After the repairs and alterations were well under way, Mr. Mahler, a Keystone foreman, found it difficult to obtain welders who would do certain minor welding at night. Purely upon his own volition, he asked Chief Harrell, of the Casa Grande's crew, whether or not he and other members of the crew with some welding experience would undertake such work on their off hours. Harrell found certain crewmen who were willing. Mahler then obtained permission from his superior to hire these Navy men. The crewmen, in turn, obtained the permission of their executive officer, Mr. Walker. He granted permission subject to authority contained in a Secretary of the Navy directive (SECAAV Instructions 1050.2, dated March 7, 1956) permitting Navy personnel to work after duty for civilian employers.

Thereafter, the work of the Naval personnel proceeded as follows. At the end of the work day of Keystone's civilian employees, Mahler instructed Harrell as to what welding was to be done at night. In turn, Harrell relayed Mahler's instructions to the Navy crew. Harrell kept time records for all the Navy workers which were given to Mahler and by him to Miss Friedman who kept Keystone's payroll records. Keystone paid the Navy personnel at approximately the same rate its civilian employees received. Union dues were substracted from their pay. While working on the Keystone contract, these crewmen were under the direction and control of Keystone subject to the paramount authority of the Navy.[10] Mr. Mahler, or his assistant, Di Carlontonio, instructed the men where to work, what work to do and marked out with chalk the areas where the welding was to be done. They used Keystone tools in doing the work. At one point, Di Carlontonio complained to Harrell about the type of work and " * * * told the Chief (Harrell) they weren't welding that job right. I told him from now on anything he welds I want him to see me", and " * * * from now on you (Harrell) stop down here any time during the afternoon and I will show you what you can let your men weld at night."

From the evidence, it is my conclusion that these Navy crewmen were working as employees of Keystone on an "off hour" status. They were not engaged in their own Naval work but were working for an independent contractor. The government did not create the situation— rather Keystone, without consultation with the officers of Casa Grande or those higher in the Naval hierarchy, approached the enlisted personnel who in turn secured permission from their superior to work for Keystone on an "off hour" status under appropriate Navy regulations. Nor does the fact that the work was being performed on a Navy ship alter the situation in my judgment.[11] There is no evidence that the Navy, anxious to have the repairs finished, suggested that its enlisted personnel be hired to speed up the work.

As said in 56 C.J.S. Master and Servant § 2(2):

10. In any emergency, they would, of course, be subject to the orders of their officers.

11. Westover v. Hoover, 88 Neb. 201, 129 N.W. 285, 19 A.L.R. 215 contains a good discussion on this point and cites a number of authorities. Upon weaker facts than in this case, it still held that the plaintiff was employed by an independent contractor at the time the accident happened. A case very much on point and still authoritative insofar as concerns the agency question is The Turquoise, D.C. E.D.Pa., 114 F. 402.

"Under some circumstances a person may be the servant of two masters at the same time; and the general servant of one master may, with his consent, be lent to another person and become his servant with respect to a particular transaction or piece of work.

"Ordinarily a person cannot be the servant of two masters at the same time. There are, however, exceptions to this rule; and under some circumstances a person may have two different employers concerning whom his rights may differ. Thus a person may be the servant of two masters at one time and as to one act, even though they are not joint employers, provided the service to one does not involve abandonment of the service to the other.

"Servant lent or hired to another. The general servant of one person may be lent to, and become the servant of, another by submitting himself to the direction and control of the other with respect to a particular transaction or piece of work, even though the general employer has an interest in the special work, and in such case the servant remains the general servant of the lender except as to the particular work done for the borrower. However, such a relation between the borrower and the servant is not established unless it appears that the servant has expressly, or by implication, consented to the transfer of his services to the new master, and unless the lender surrenders and the borrower assumes the power of supervision and control."

The facts here support the conclusion that Keystone for its own reasons approached the government on the basis that it needed the temporary loan of some of its enlisted personnel in connection with its contract on the Casa Grande. The request was granted and during certain off duty hours at night, these men performed work for Keystone. They were paid by Keystone and were subject to its immediate direction as to how the work should be done. It follows that during the periods which this work was being performed, the status of the enlisted personnel was that of employees of Keystone. Pennsylvania Co., etc. v. Philadelphia Electric Co., 331 Pa. 125, 200 A. 18. Thus, even if the defective staging in question were erected by these Navy men, liability therefor cannot be attributed to the government. Compare Leonard v. United States, 10 Cir., 235 F.2d 330; United States v. Sharpe, 4 Cir., 189 F.2d 239.

The conclusions here reached make it unnecessary to decide whether or not the plaintiff was wholly responsible for his own injury [12] and whether or not the Navy enlisted personnel or civilian employees of Keystone had actually welded the defective supports, a sharply disputed point.

In conclusion, the work in which Allen was engaged at the time of his injury was not traditional ship's work and, consequently, he was not entitled to the absolute warranty of seaworthiness. Moreover, although the government was duty bound to use reasonable care for his safety, it was guilty of no negligence which in any way contributed to his fall. The government not being liable, it necessarily follows that there can be no liability over on the part of Keystone under the indemnity contract.

What has been said herein shall constitute findings of fact and conclusions of law.

Order upon notice.

12. He gave a statement immediately after his fall to a Navy hospital corpsman to the effect that he had unthinkingly burned off one of the supports which held up the planking he was standing on.