James S. RAIDY, Libelant,

v.

UNITED STATES of America, Respondent,

(Bethlehem Steel Company, Shipbuilding Division, Respondent-Impleaded).

No. 3858.

United States District Court
D. Maryland, Admiralty Division.

July 26, 1957.

Bernard M. Goldstein, Baltimore, Md., for libelant.

Leon H. A. Pierson, U. S. Atty., Baltimore, Md., Carl C. Davis, Dept. of Justice, Washington, D. C., for United States. David R. Owen, Semmes, Bowen & Semmes, Baltimore, Md., for respondent-impleaded.

CHESNUT, District Judge.

The libelant, a Bethlehem shipyard worker, has brought suit against the United States as owner of the dredge "Goethels" to recover for injuries sus-

14. See Van Huffel v. Harkelrode, 284 U.S. 225, 228, 52 S.Ct. 115, 76 L.Ed. 256.

tained by him when he fell on board that vessel while it lay in drydock at the Bethlehem shipyard, Key Highway, Baltimore, Maryland. The United States has impleaded the Bethlehem Steel Company, Shipbuilding Division, to whom the ship had been turned over under contract for major repairs.

The principal question presented by this case is whether the shipowner's duty to provide a seaworthy ship extends to a shipyard worker engaged in making major repairs aboard a vessel in drydock. The libelant's complaint contains also a count charging liability of the ship for alleged negligence in not providing a safe place for the libelant to work; but the emphasis of the claim is placed on alleged unseaworthiness.

From the evidence in the case I find the following relevant and important facts:

1. The SS Goethels is a seagoing hopper dredge of about 9,000 tons displacement, owned by the respondent, the United States of America.

2. On July 9, 1954 the United States entered into a master contract, No. DA-36-109-eng-5728, for repair and alteration of vessels with the Bethlehem Steel Company, Shipbuilding Division, respondent impleaded. Pursuant to this contract a supplemental agreement designated Job Order No. 1, was entered into on August 30, 1954, by the terms of which Bethlehem was to perform major structural repairs on the dredge Goethels including conversion of the sump re-handling system from a bottom dump method of unloading to a pump unloading system at an approximated cost in excess of $600,000. The Goethels was to be delivered into the possession of Bethlehem, and the manner of performance and the scheduling and progress of the repairs and conversion work were to be under the control of Bethlehem until re-delivery upon acceptance of the job by the United States. Bethlehem also agreed to provide a safe place to work for its employees and in addition to indemnify the United States against any liability for personal injury resulting from the fault, negligence, wrongful acts or omissions of Bethlehem. The United States as shipowner reserved a bare right to inspect all work and materials to insure compliance with specifications. In accordance with the job order, the Goethels was delivered to Bethlehem at its Key Highway plant on September 14, 1954, where it remained until accepted by the United States upon completion of the work on December 9, 1954. The crew was dismissed, the power and engines were shut down, and Bethlehem as contractor was to furnish all power, lighting and staging required on the job. On October 25, 1954 the vessel was placed in drydock for 13 days to facilitate the installation of new hoppers, a part of the conversion of the sump re-handling system.

3. In October 1954, the libelant, James S. Raidy, had been in the employ of Bethlehem as a shipyard fitter for a year or more and was a member of one of the gangs assigned to work on the Goethels. On October 27, 1954, the libelant came on the vessel at approximately 4:30 P.M. and was instructed to work in the interior until at approximately 6:45 P.M. He and a co-worker, a Mr. George Henneman who testified in the case, under the direction of their leader (foreman) were instructed to run a chalk line to establish a center line which was to be used as a guide in the installation of the new hoppers in the dredge. In performance of this work the libelant while carrying the line, was backing along a metal plate operating walkway. As he backed along this walkway the libelant had to work his way around a wooden staging platform approximately five feet in height which resembled a carpenter's work bench and which had been placed on the walkway and used by Bethlehem in the conversion work. Immediately behind this platform one of the metal plates in the walkway had been removed by Bethlehem and as he backed around the platform the libelant plunged through the

hole left by the removed plate some twenty-five or thirty feet into the No. 1 mixing well below. Although there is no evidence in the case that the libelant had actual knowledge of the absence of the plate, this plate and several others had been removed as a necessary step in the progress of the repair work. They were removable in order to allow access to piping or other structures underneath. These removable metal plates were about 2 feet by 3; 6 or 7 of such plates had been previously removed as testified to by Raidy's co-worker, Henneman. At the time of the accident (approximately 7:00 P.M.) it was dusk. There was a 300-watt lamp about 20 feet away but the lighting was described at the trial by an apparently disinterested and competent witness as poor at the time. Libelant had a flashlight in his pocket and said he was using it. It was found in his pocket immediately after his fall. Libelant sustained severe injuries by this fall, and he was immediately removed to the Maryland General Hospital for treatment. He did not return to work until April 24, 1955. During the period from October 27, 1954, the date of the accident, until April 24, 1955, when he returned to work, libelant received compensation in the amount of $35 per week from his employer who also paid all his medical and hospital bills, and in consequence is precluded by the Longshoremen's and Harbor Workers' Compensation Act from suit against his employer, Bethlehem.

4. The conversion and repairs being made by Bethlehem on the Goethels and more particularly the work being performed by the libelant were not the type of services historically and traditionally rendered to the ship by members of the crew but to the contrary required the facilities and skilled personnel of a modern well equipped shipyard.

5. On these facts and in the circumstances stated I find and conclude that (a) there was no negligence on the part of the shipowner causing or contributing to the libelant's injuries and (b) the ship at the time was not "unseaworthy".

Turning now to the applicable law, the libelant seeks to have the court extend to him the shipowner's absolute duty to provide a seaworthy ship traditionally owed to seamen who sailed with the ship and were subjected to the perils of the sea. This doctrine of seaworthiness has recently been extended by the Supreme Court to cover a longshoreman stevedore who was injured while aboard the ship although employed by an independent contractor engaged by the owner to load the ship. Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099. The Court reasoned that since the loading and unloading of a ship was the type of work historically performed by members of the crew of the ship, stevedores engaged in such work and being subjected to the hazards of the sea to that extent, should likewise be afforded a seaworthy ship.[1] More recently this doctrine has been extended to include within its protection a shoreside carpenter employed by an independent contractor who had been called on board a vessel, which was in port and being loaded, to repair a slight defect in the loading equipment and was injured while doing so. Pope & Talbot, Inc., v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143. Likening the claimant's position to that of the stevedore in the Seas Shipping case, supra,

[1]. In support of the contention that the holding in the Seas Shipping case should not be further extended to include the libelant in this case, counsel for the United States refers to a 1954 paper by Francis L. Tetrault published in 39 Cornell Law, Quarterly, 381, which discusses on historical and economic grounds, the applicability of the doctrine of unseaworthiness (liability without fault) to various shore-side ship workers other than members of the crew. Among other points the paper challenges on historical grounds the accuracy of the view that the loading of ships was historically and traditionally the work of the crew, p. 414.

and declaring that the slight differences could not justify a distinction between the two cases, the court stated, 346 U.S. at page 413, 74 S.Ct. at page 207:

"The ship on which Hawn was hurt was being loaded when the grain loading equipment developed a slight defect. Hawn was put to work on it so that the loading could go on at once. There he was hurt. His need for protection from unseaworthiness was neither more nor less than that of the stevedores then working with him on the ship or of seamen who had been or were about to go on a voyage. All were subjected to the same danger. All were entitled to like treatment under law."

Both decisions were made by the majority of the court over a substantial dissent. Later in 1954 the Supreme Court, again over a strong dissent, affirmed without opinion the decision of the 9th Circuit Court of Appeals which held a stevedore entitled to recover under the Seas Shipping doctrine, for injuries sustained as the result of defective equipment brought on board by the stevedoring company, and used in the loading of the ship. Alaska Steamship Co. v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798.

The contention of the United States is that neither by reason nor authority can the doctrine of the Seas Shipping case, supra, be applied to a shipyard worker where the vessel is in a floating drydock for very substantial structural changes under the circumstances of this case. I agree with this contention, and therefore hold that the libelant is not entitled to recover against the United States in this case.

The doctrine of the Seas Shipping case decided in 1946 has been so extensively considered in subsequent federal district and circuit courts of appeal decisions that it would be an unnecessary repetition to review them all in detail. However, there are three quite recent decisions which have refused to extend the doctrine of the Seas Shipping case in favor of shipyard workers under circumstances closely similar to those in the present case. These three cases are—Berryhill v. Pacific Far East Line, 9 Cir., 1956, 238 F.2d 385, where a shore-side machinist employed by a shipyard firm engaged in making major repairs on board a dry-docked vessel was denied the protection of the doctrine of seaworthiness when a grinding wheel furnished by his employer exploded injuring him; West v. United States, D.C.E.D.Pa.1956, 143 F.Supp. 473, where a shore-side repairman employed by an independent contractor was held not to be doing the type of work traditionally performed by seamen and was denied recovery based on the alleged unseaworthiness of a vessel while at a dock; and Berge v. National Bulk Carriers, D.C.S.D.N.Y.1957, 148 F.Supp. 608, where an injured shore-side rigger employed by a ship repair firm engaged to make major repairs aboard a vessel while in drydock was held not to be engaged in services usually performed by seamen and recovery based on the alleged unseaworthiness of the vessel was denied. Compare Read v. United States, 3 Cir., 1953, 201 F.2d 758. See also Lester v. United States, 2 Cir., 1956, 234 F.2d 625, certiorari at first granted, 1956, 352 U.S. 889, 77 S.Ct. 130, 1 L.Ed.2d 85, but subsequently dismissed possibly by stipulation. I find nothing in the case of Ross v. Steamship Zeeland, 4 Cir., 1956, 240 F.2d 820, that presents the legal issue here involved.

In the Berryhill case, supra, where the facts were quite similar to the instant case, the Supreme Court has very recently denied certiorari. 77 S.Ct. 1400. While this is, of course, subject to what has so often been said by the Supreme Court as to the effect of denial of certiorari, it would still seems to be of some consequence here in view of the many recent cases in which the doctrine of the Seas Shipping case has been considered by the federal courts. Counsel for the United States states that he

has very recently argued the West case on appeal to the Third Circuit.

The admiralty doctrine of implied unseaworthiness of a ship sprang from a consideration of the particular hazards affecting the crew of a ship in navigation. The Osceola, 1903, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760. There has been much federal legislation since then for the benefit of seamen. See Jones Act, 46 U.S.C.A. § 688; Suits in Admiralty Act, 46 U.S.C.A. §§ 741–752. See also dissenting opinion of Mr. Justice Jackson in Pope & Talbot, Inc. v. Hawn, 1953, 346 U.S. 406, 419, 74 S.Ct. 202, 98 L.Ed. 143. In International Stevedoring Co. v. Haverty, 1926, 272 U.S. 50, 47 S.Ct. 19, 71 L.Ed. 157, the Supreme Court held that in a suit to recover for personal injuries based on negligence of a shipowner, a stevedore could be considered as a seaman. In 1927 Congress passed the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. §§ 901–950, which includes stevedores although it excluded members of the crew of a ship. It is my understanding that this exclusion was in consequence of positions taken by seamen's unions that they did not wish to be included in the Act.

In the instant case the libelant shipyard worker was performing duties not within the competence or the traditional or customary activities of the crew. His status therefore was very different from that of a seaman. The ship was in drydock for structural changes which could not have been performed by the crew. In fact the crew had been discharged long before the accident occurred. The ship at the time was not subjected to any perils of navigation. In fact it had necessarily been withdrawn from navigation for a long period. The owner maintained no control over the work by the independent contractor other than the right to inspect to determine whether the structural changes were being performed in accordance with the elaborate specifications. It seems to me a misnomer to speak of the removable and absent footplate as "unseaworthiness of the ship". The removal of the absent plate, for the substitution of others, was a part of the work required to be performed by the contract specifications.

I find there was no negligence by the United States with respect to the condition of the ship or causing the libelant's injuries. It is unnecessary to decide whether there was negligence on the part of the Bethlehem Company because it has complied with all requirements of the Longshoremen's Act. It could not be legally liable in this case for additional sums if it could be found negligent in failing to provide the libelant with a safe place to work. As the ship in this case is not liable, there is no occasion to consider possible liability of Bethlehem as an impleaded respondent. If the libelant has further remedy it must be under the Longshoremen's and Harbor Workers' Compensation Act.

For all these reasons I conclude that the libelant is not entitled to recover in this case and the libel must therefore be *dismissed,* and for that reason the petition impleading Bethlehem Company must also be dismissed.