251 F.2d 708
 Anna HALECKI, Administratrix ad Prosequendum of the Estate of Walter Joseph Halecki, deceased, and Anna Halecki, Administratrix of the Estate of Walter Joseph Halecki, deceased, Appellee,
v.
UNITED NEW YORK AND NEW JERSEY SANDY HOOK PILOTS ASSOCIATION, a corporation and United New York Sandy Hook Pilots Association, a corporation, Appellants.
 No. 94.
 Docket 24551.
 United States Court of Appeals Second Circuit.
 Argued November 21, 1957.
 Decided January 10, 1958.
 
 COPYRIGHT MATERIAL OMITTED Lawrence J. Mahoney, Dougherty, Ryan & Mahoney, New York City, for defendants-appellants.
 Nathan Baker, Baker, Garber & Chazen, Hoboken, N. J., for plaintiff-appellee, Bernard Chazen, Milton Garber, Hoboken, N. J., on the brief.
 Before HAND, HINCKS and LUMBARD, Circuit Judges.
 HAND, Circuit Judge.
 
 
 1
 This appeal is from a judgment for the plaintiff entered on the verdict of a jury, awarding damages for the death of the plaintiff's decedent while engaged in cleaning the pilot boat, "New Jersey," belonging to the defendants. The complaint was based upon two counts; one for negligence and the other for unseaworthiness, and four errors are alleged. First, that the evidence was not sufficient to justify a verdict on either count. Second, that the court erred in submitting to the jury any question of seaworthiness. Third, that the court should have charged the jury that under the New Jersey Death Statute contributory negligence was a bar and not a limitation upon damages. Fourth, that the defendants should have been allowed to show that the plaintiff had made inconsistent allegations in another and pending litigation.
 
 
 2
 On September 22, 1951, the "New Jersey," a pilot boat, was moored at a pier in the repairyard of Rodermond Industries, Inc., North River, Jersey City, for annual overhaul and repairs; the only employee of the defendants on board was a watchman. Part of the work was to clean the ship's generators which had become fouled in use, and Rodermond Industries subcontracted this part of the job to K. & S. Electrical Company, the employer of the decedent, Halecki. On the 28th he and Doidge, a fellow worker, set up the necessary equipment on the boat. Since she was at the time without any electrical current, it was necessary to bring in current from the shore. The generators were cleaned by spraying them with carbon tetrachloride, a volatile liquid, which will "remove all traces of dirt and film," but whose fumes, unless their density is carefully controlled, may be deadly. The generators were in the ship's engine-room, one deck below the main deck, and Doidge and the decedent sought to protect themselves during the work, (1) by using gas masks, and (2) by bringing two "air hoses" and a "blower," actuated by the current from the shore. One hose was used to spray the tetrachloride upon the generators; the other, to blow in fresh air from the outside. The "blower" was set at the bottom of the engine-room near the generators, and from it led an exhaust pipe to an open door about eight feet above. In addition, the ship's permanent ventilating system was set in action by the outside current; it consisted of some fans and "vents" at the top of the engine-room through which air was drawn in. Thus, means of exhausting the contaminated air consisted of (1) the hose that was not used to spray, (2) the "blower," and (3) the increase of air pressure resulting from the intake of the ship's own ventilating system. Besides this, an open door and an open skylight led to the air. A biochemist, familiar with the use of tetrachloride, after being told in detail the size of the engine-room and the apparatus installed, gave as his opinion that the ventilating system in the engine-room, even when supplemented by the apparatus brought on board and installed by Doidge and the deceased was not "adequate to remove the fumes." The competence of this expert to give an opinion was so much within the discretion of the trial court that only in a clear case should we overrule its decision.[1] The state law of evidence is no longer the final test of the admissibility of evidence.
 
 
 3
 As we have said the case was left to the jury in a double aspect: (1) whether the defendants had been negligent in furnishing the deceased as a "business guest" with an unfit place to work and (2) whether the ship was unseaworthy vis-à-vis a shore worker who came aboard to take part in the annual overhaul. It is obvious therefore that the plaintiff's evidence had to support a verdict on both claims; for we cannot know that the unsupported claim was not the one on which alone they brought in their verdict. As to the claim based on negligence, so far as the defendants mean to argue that the engine-room, equipped as it was, was a reasonably safe place in which to work, we hold that the evidence created an issue that could be decided only by a verdict. The deceased was certainly an "invited person," or "business guest," and the shipowner was liable, not only for the negligence of the master,[2] but, although the work was let out to a subcontractor, also for any lack of "reasonable care to ascertain the methods and manner in which the concessionaire or independent contractor carries on his activities, not only at the time when the concession is let, or the contractor employed, but also during the entire period in which the concessionaire or contractor carries on his activities."[3] Being charged with knowledge that so dangerous a substance as tetrachloride might be used, it was proper to leave to the jury whether the "methods and manner" of its use were proper. So much for the negligence count.
 
 
 4
 Quite a different question arises as to the warranty of seaworthiness, for, if that attached, it imposed an absolute liability, if the engine-room was not properly equipped. Although in a very scholarly analysis of the earlier decisions, it has been recently argued that the maritime law did not impose such a warranty in favor of seamen,[4] rightly or wrongly the opposite doctrine has become so firmly settled since The Osceola, 1902, 189 U.S. 158, 23 S.Ct. 483, 47 L.Ed. 760, that we decline to reconsider the question. All that is left for us on this appeal is whether the warranty of seaworthiness extended to the decedent although concededly he was not a seaman, but as we have said, a "business guest" on a vessel within the navigable waters of New Jersey. In Guerrini v. United States, 2 Cir., 167 F.2d 352, the ship, as in the case at bar, was moored in Brooklyn alongside a dock, and the libellant, an employee of a subcontractor, was engaged in cleaning her boilers and tanks, when he was hurt by slipping on a grease spot. We held that the doctrine of Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, did not apply. However, that was in 1948 before either Pope & Talbot v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 or Petterson v. Alaska SS. Co., 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798, was decided; it is now clear that we were wrong both in limiting the warranty to those doing longshoremen's duties and in supposing that the surrender of "control" of the ship was relevant. We can see no distinction between the work of the decedent in the case at bar and that of the plaintiff in Pope & Talbot v. Hawn, supra, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143, which was carpenter's repair work. We think that the test is whether the work is of a kind that traditionally the crew has been accustomed to do, and as to that it makes no difference that the means employed have changed with time, or whether defective apparatus was brought aboard and was not part of the ship's own gear. Since the deceased was cleaning the ship, we hold that it was within the doctrine of Pope & Talbot v. Hawn, supra.
 
 
 5
 As might be expected, so shadowy a line of demarcation will in application produce inconsistent results. For example, in Read v. United States, 3 Cir., 201 F.2d 758, the Third Circuit held that the warranty extended to a "business guest" who was doing part of the work of changing a "Liberty" ship into a transport, while the Ninth Circuit in Berryhill v. Pacific Far East Line, 238 F.2d 385, certiorari denied 354 U.S. 938, 77 S.Ct. 1400, 1 L.Ed.2d 1537 refused relief to a workman who was engaged in "major repairs," as these were described in the District Court (138 F.Supp. 859). In the appeal in Berge v. National Bulk Carriers, Inc., D.C., 148 F.Supp. 608, decided herewith, we shall state the reasons that impel us to prefer the decision of the Ninth Circuit, but it is not necessary to pass on that question here, because as we have said, the work did not involve any structural changes in the ship, but was of a kind that was part of the crew's work, not only at sea, but when she was laid up for general overhaul. We start therefore with the conclusion that it was proper to leave to the jury, not only the issue of negligence, but that of unseaworthiness.
 
 
 6
 That does not however answer two other objections: (1) that the plaintiff is not the decedent, but an administratrix, and (2) that the judge left the decedent's contributory negligence to the jury, not as a bar, but only in limitation of damages. It is common ground that the liability for breach of the warranty of unseaworthiness does not survive under the maritime law (The Harrisburg, 119 U.S. 199, 7 S.Ct. 140, 30 L.Ed. 358; Lindgren v. United States, 281 U.S. 38, 50 S.Ct. 207, 74 L.Ed. 686). As to the maritime tort, § 33 of the Merchant Marine Act of 1920 (Title 46 U.S.C.A. § 688) gave to "the personal representatives" of a deceased seaman the same remedies that the deceased would have had, had he lived. However, in the case at bar the deceased was not a seaman, so that upon both counts the plaintiff must resort to the "Lord Campbell's Act" of New Jersey[5] which provides in general terms: "When the death of a person is cause by a wrongful act, neglect or default, such as would * * * have entitled the person injured to maintain an action for damages * * * the person who would have been liable * * * shall be liable in an action for damages." Much controversy has arisen over the scope of the phrase just quoted, making the liability to the next of kin depend upon an "act, neglect or default" of the putative obligor. When the question arose in the Third Circuit whether these words covered a breach of the warranty of seaworthiness, the court in banco by a vote of four to three held (Skovgaard v. The Tungus, 3 Cir., 252 F.2d 14) that they did. In spite of the zeal with which the contrary has been argued, we think that the majority was right. Graham v. A. Lusi, 5 Cir., 206 F.2d 223 does not actually hold the contrary; though that may have been the court's opinion. Its decision was based solely on the point of contributory negligence, and did not pass upon the ruling of the district court that the libel could not rest on breach of warranty. Lee v. Pure Oil Co., 6 Cir., 218 F.2d 711 held that, even vis-a-vis the deceased, there was no breach of warranty, and then went on to say that in any event his administratrix could not recover. The report does not tell us what was the language of the Tennessee statute; but if it was the same as that of New Jersey, we are not persuaded. We hold that "neglect" and "default" both cover a breach of the warranty.
 
 
 7
 There remains, however, the further question: i. e., whether contributory negligence is an absolute defense. Before the decision of the Supreme Court in Pope & Talbot v. Hawn, supra, it had been generally held that when a seaman before the Merchant Marine Act of 1920, or a shoreworker thereafter, had been killed because of the negligence of the ship's crew in the navigable waters of a state having a local Lord Campbell's Act, contributory negligence was a bar to an action by his next of kin. This was as true when the suit was in the admiralty as in a court of the state; in short, the bar arising from contributory negligence was an incident of the liability imposed by the state, no matter where suit upon it was brought.[6] In Pope & Talbot v. Hawn, supra, however, the Court held that contributory negligence was not a bar to an action at law by a "business guest," but only limited his damages, and this we read to mean that rights arising from faults that occur in navigable waters are exclusively the creation of maritime law, and are exempt from the defense of contributory negligence whether suit upon it is in the admiralty or in an action at law, state or federal.[7] The following language we take from the opinion of the majority in that case, 346 U.S. at pages 409, 410, 74 S.Ct. at page 205: "[the] right of recovery for unseaworthiness and negligence is rooted in federal maritime law. Even if Hawn were seeking to enforce a state-created remedy for this right, federal maritime law would be controlling. While states may sometimes supplement federal maritime policies a state may not deprive a person of any substantial admiralty rights as defined by acts of Congress or by interpretative opinions of this Court." Although, as we have said, we are not dealing with "federal maritime law," we should remember that so far as we can we ought to construe the statute so as to avoid capricious and irrational distinctions. We leave open whether New Jersey is without power to take as much or as little of the rights "rooted in federal maritime law" as it chooses as the model for the right it confers upon the next of kin; but the courts of that state have never passed upon the question, and to deny the exemption to the next of kin seems to us to the last degree capricious and irrational. Although it was only a dictum, the First Circuit in O'Leary v. United States Lines Co., 215 F.2d 708, 711, declared that "it would be incongruous to hold, in conformity with Pope & Talbot v. Hawn, supra, that the maritime law determined the respective rights of the parties in the event of personal injuries short of death, but that state law determined their rights in the event of injuries resulting in the ultimate consequence of death." We are aware that Curtis v. A. Garcia, 3 Cir., 241 F.2d 30, 36 is to the contrary, but as neither it nor O'Leary v. United States Lines Co., supra, is authoritative, we are free to choose. Obviously, the answer is not certain; we must do as best we can with what we have, and we hold that the New Jersey statute should be construed as taking over as a part of the model it accepted the exemption of contributory negligence as a bar.
 
 
 8
 Finally, the defendants complain that the judge refused to allow them to prove that the plaintiff in another action had asserted that Rodermond Industries had control of the vessel. Even though this were an error — on which we do not pass — obviously it was not of enough importance to reverse the judgment.
 
 
 9
 Judgment affirmed.
 
 
 
 Notes:
 
 
 [1]
 United States v. Miller, 2 Cir., 61 F.2d 947, 949, 950; Tucker v. Loew's Theatre & Realty Co., 2 Cir., 149 F.2d 677, 679; Trowbridge v. Abrasive Co., 3 Cir., 190 F.2d 825, 829; 2 Wigmore, § 561
 
 
 [2]
 Leathers v. Blessing, 105 U.S. 626, 630, 26 L.Ed. 1192
 
 
 [3]
 Restatement of Torts, Vol. II, § 344, Comment b
 
 
 [4]
 "Seamen, Seaworthiness and the Rights of Harbor Workers," Francis L. Tetrault, 39 Cornell Law Quarterly, 381
 
 
 [5]
 N.J.S.A. 2A:31-1
 
 
 [6]
 Robinson v. Detroit & C. Steam Navigation Co., 6 Cir., 1896, 73 F. 883; Quinette v. Bisso, 5 Cir., 1905, 136 F. 825, 5 L.R.A.,N.S., 303; O'Brien v. Luckenbach S.S. Co., 2 Cir., 1923, 293 F. 170; Klingseisen v. Costanzo Transp. Co., 3 Cir., 1939, 101 F.2d 902; Graham v. A. Lusi, Ltd., 5 Cir., 1953, 206 F.2d 223; The A. W. Thompson, D.C.S.D.N.Y.1889, 39 F. 115, per Addison Brown, J.; The James McGee, D.C.S.D.N.Y.1924, 300 F. 93
 
 
 [7]
 Cf. Garrett v. Moore-McCormick Co., 317 U.S. 239, 63 S.Ct. 246, 87 L.Ed. 239
 
 
 
 10
 LUMBARD, Circuit Judge (dissenting).
 
 
 11
 I cannot agree that we must subscribe to the principle that a shore-based worker who performs any labor on a ship, even though the ship is out of operation and tied fast to a dock for overhaul, should have extended to him a warranty of seaworthiness merely because the work which he is doing can be generally characterized in terms of the duties which a seaman could be expected to perform. It is not enough to categorize Halecki's work as cleaning ship's equipment. Here the inescapable fact is that Halecki, in spraying the generators with carbon tetrachloride, was doing something which a seaman could not do, which no seaman had ever done and which would expose the seaman's life to serious danger if he even attempted it.
 
 
 12
 A summary of the evidence showing how the generators were cleaned by spraying with carbon tetrachloride shows the absurdity of assimilating this work to that of a seaman or of saying that the work "is of a kind that traditionally the crew has been accustomed to do."
 
 
 13
 On Saturday, September 22, 1951 the pilot boat "New Jersey," owned by the appellants, was turned over to Rodermond Industries, Inc. for its annual overhaul and inspection. It was moored at the Rodermond repair yard pier at the foot of Henderson Street, North River, Jersey City, New Jersey. A list of repairs, prepared by Rodermond the following Monday, September 24 provided that the crew was to remove and replace the eight cylinder heads for the port and starboard generators, and the contractor was to do some work on the cylinder heads. Under the same heading "Port & Star Generators" it was provided:
 
 
 14
 "Spray clean with carbon tetrachloride the armature and field windings to remove all traces of dirt and film. Close up and prove in good order."
 
 
 15
 Rodermond in turn subcontracted with Halecki's employer, the K & S Electrical Company, to do certain electrical work and to spray the generators with carbon tetrachloride, since neither ship nor shipyard was equipped or competent to do this work. The K & S foreman, Donald Doidge, was at work on the New Jersey from Monday, September 24, and on that day he consulted with the New Jersey's chief engineer as to when the spraying should be done as "we know it has to be done when there is nobody else on board ship." Doidge agreed with the chief engineer that it should be done on Saturday during the absence of the crew, since during the week members of the crew were working on the ship.
 
 
 16
 Pursuant to these arrangements, Doidge and Halecki made preparations on Friday for the Saturday spraying. Doidge, the shop foreman, had been an electrician for about 25 years and Halecki had worked with him for about 6 years. Not all their work was on ships; they cleaned generators by carbon tetrachloride spray in factories and buildings, wherever the generators were. On Friday they brought on board extra air hoses and a blower belonging to Rodermond. One air hose was used for the spray gun and the other was used underneath the generator as an exhaust to blow the fumes away from the man spraying. A high compression "blower" was placed so that it would exhaust foul air out through one of the two open doorways.
 
 
 17
 On Saturday morning, September 29, according to the previous arrangement, Doidge and Halecki came aboard to do the spraying. They found only the defendant's watchman, Walter C. Thompson, and they told him to stay out of the engineroom and not to let anybody down. They brought with them three gas masks belonging to K & S Electric Company. Halecki wore a gas mask and did most of the spraying 10 to 15 minutes at a time with intervening rest periods of equal length. All the equipment for exhausting the fumes and the ship's ventilating system were in operation and run by power supplied from generators on shore. Halecki took sick the next day and died two weeks later. There was sufficient evidence to support the jury's finding that death was caused by carbon tetrachloride poisoning.
 
 
 18
 Despite history and logic, the trend of decisions in cases involving injuries and death on navigable waters, now further extended by my distinguished colleagues, seems to be guided by what Justice Rutledge has frankly called a "humanitarian policy." Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 95, 66 S.Ct. 872, 90 L.Ed. 1099. This policy seems to be based on the theory that judges are competent to determine that it is better that the shipowners should assume all the burdens because they are able to average them out through insurance or some form of protection against all the hazards of accident which may occur on shipboard to anyone coming on board. The result has been a progressive expansion, both qualitative and quantitative, in the duties and liabilities imposed upon shipowners.[1] From a concept resting on negligence, seaworthiness has, by judicial development, become an absolute duty imposing liability without fault. From a duty running to those we traditionally consider as seamen, exposed to the hazards and discipline of the sea, it has been expanded to include a multitude of harbor workers who report for work in the morning and return to their homes at night. The burdens of proving lack of due care and of defending against the bar of contributory negligence are jettisoned by this judicial legislation. Where there is the slightest support for causation the only question for the jury is the amount of damages.
 
 
 19
 It may be argued that the initiative taken by the federal courts in imposing absolute liability is justified by their peculiar historical responsibility for admiralty law. And we are told that certain harbor workers come within the ambit of the warranty of seaworthiness because a shipowner cannot escape liability by delegating to others what is traditionally seamen's work. Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 95, 66 S.Ct. 872, 90 L.Ed. 1099. Here we go further. When a lower court charges on both seaworthiness and negligence toward a business invitee, we must assume that the only justification for the charge on seaworthiness is that the shipowner may be found liable despite his own due care. By assimilating certain activities to maritime law, we extend the absolute liability of shipowners, in effect, beyond the shipyard gates. The owner, despite the utmost care, is liable for the activities of a specialist employed expressly because these activities were beyond the range of experience and competence of the ship's crew. These circumstances rebut the contention that the shipowner is nullifying his liability by parcelling out ship's work to others.
 
 
 20
 The anomaly of the result reached here is pointed up when we consider the restricted liability of the specialist's employer, who is in the most favorable position to reduce the incidence of injury. Unlike the shipowner, the immediate employer's liability is restricted to the insurance expenses of workmen's compensation or to damages incurred due to his lack of due care. Although the shipowner was not Halecki's employer and this was essentially an industrial injury resulting in the death of a shore-based electrician, an absolute liability of judicial creation is imposed upon the shipowner above and beyond the system developed by New Jersey to compensate for industrial accidents. I had thought that such far-reaching changes in rights and legal duties were solely within the province of the elected representatives of the people in Congress and not the proper business of judges. The traditional responsibility of the federal judiciary for admiralty does not justify such an expansion of liability.
 
 
 21
 Halecki risked all the hazards of the sea as one might experience them on a Saturday in late September while the ship was made fast to a bulkhead in Jersey City. He was not a seaman, he was not doing what any crew member had ever done on this ship or anywhere else in the world so far as we are informed. Whatever reasons there may be for extending the warranty of seaworthiness to stevedores or other harbor workers who work on board, they do not apply to those employed to do a special job of such a dangerous and unusual nature that it is beyond the competence of ship and shipyard, necessitates the removal and exclusion of the crew, and requires bringing extra equipment aboard for the safe performance of the hazardous activity.
 
 
 22
 The case of Berryhill v. Pacific Far East Line, 9 Cir., 1956, 238 F.2d 385 certiorari denied 354 U.S. 938, 77 S.Ct. 1400, 1 L.Ed.2d 1537, is authority for the proposition that when the manner of doing the work is foreign to what the ship's crew could do and involves the use of equipment not used or known on ships, there is no warranty of seaworthiness running to those who are injured in the course of doing such work by reason of any defect in the equipment so used. In that case the plaintiff was injured by the shattering of a grinding wheel brought on board by his employer, Todd Shipyards Corporation, for use in repairs being made on the "shaft keyway" on defendant's ship. The Court of Appeals held there was no warranty of seaworthiness with respect to the grinding wheel. Judge Barnes pointed out that to hold otherwise would go beyond the Sieracki, Hawn and Petterson[2] cases as the grinding wheel was equipment that the ship could do without, and the shipowner may never have had any reason to know that such equipment existed. That the kind of equipment used is foreign to the vessel is just another way of saying that the work done is not the kind of work normally done by seamen.
 
 
 23
 My brothers say that this work was merely cleaning a generator and, as cleaning propulsion machinery is the kind of work which seamen would normally do, cleaning a generator is seamen's work and those who do it are entitled to a warranty of seaworthiness. This assimilates spraying with carbon tetrachloride to all cleaning as if it were harmless and commonplace; it is a play on words which by a characterization avoids dealing with a difference in means which completely destroys the validity of the syllogism. Because seamen may be able to do some kind of cleaning does not make seamen of those who do another kind of cleaning which seamen have never done and cannot do; nor does it supply any reason why an outside specialist should be treated, or needs to be treated, like a seaman.
 
 
 24
 That such general characterization is not a solution is emphasized by Berge v. National Bulk Carriers Corp., 2 Cir., 251 F.2d 717. There the same panel of this court holds unanimously that there is no warranty of seaworthiness to a rigger, engaged in installing a tank bulkhead in the course of rebuilding a vessel, who was injured when the shearing of a defective shackle pin caused a chain tackle to fall and knock him from a scaffold. What Halecki did was no more the kind of work that the crew of a vessel was accustomed to do than was what Berge was doing. Indeed, it was less so. One might characterize Berge's work as lowering a heavy load into the hold, a normal seaman's duty done without abnormal risk of harm. Halecki's work was entirely novel and foreign to what seamen had ever done and far more dangerous to anyone who might be aboard. As in Berge, the work required the cessation of ship's operations and the removal of the crew.
 
 
 25
 Passing this point, I must also dissent from the majority's view that under the New Jersey Death Statute, N.J.S. 2A:31-1 (1952), N.J.S.A., a maritime claim, such as Halecki's, is not subject to the defense of contributory negligence. There is no basis for saying that the New Jersey legislature meant to abandon the defense of contributory negligence in such cases and it seems to me there is every reason as a matter of common sense and usual practice for saying that they did not mean these cases to be on a different basis. I would adopt the view of Curtis v. A. Garcia, 3 Cir., 1957, 241 F.2d 30. Furthermore, it is difficult enough for admiralty lawyers and judges to keep up with the changes and developments in this field without expecting the members of a state legislature, few if any of whom are admiralty lawyers, to take over sight unseen whatever may be held to come along in the kaleidoscope of maritime rights, as against the doctrine of contributory negligence with which New Jersey and her lawyers have long been familiar. To hold otherwise seems to me to embrace a pure fiction for the purpose of implementing "humanitarian policy."
 
 
 26
 To refuse to extend the warranty of seaworthiness to Halecki and incorporate by reference comparative negligence into the New Jersey Death Statute would not leave persons in the position of Halecki's survivors without a remedy. Besides the remedies against the employer normally incident to death by industrial accident in New Jersey, see R.S. 34:15-1, 34:15-7, 34:15-8, 34:15-9, N.J.S.A., R.S.Cum.Supp. 34:15-4, N.J. S.A., such persons apparently may alternatively elect to proceed against decedent's employer under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C.A. § 901 et seq. See Davis v. Department of Labor and Industries of Washington, 1942, 317 U.S. 249, 63 S.Ct. 225, 87 L.Ed. 246; Dunleavy v. Tietjen & Lang Dry Docks, Cty. Ct.1951, 17 N.J.Super. 76, 85 A.2d 343, affirmed App.Div.1952, 20 N.J.Super. 486, 90 A.2d 84. Nor does our refusal foreclose actions against the shipowner or the shipyard for their failure to exercise due care. Indeed such an action was brought by this appellee against Rodermond Industries for its alleged negligence in the events which led up to Halecki's death. Moreover our reversal in this action would permit retrial of the cause against the shipowner on the theory of negligence.
 
 
 27
 I would dismiss so much of the complaint as relies on a warranty of sea-worthiness, and reverse and remand for a new trial on the issue of negligence.
 
 
 
 Notes:
 
 
 [1]
 See Tetreault, Seamen, Seaworthiness, and the Rights of Harbor Workers, 39 Cornell L.Q. 381 (1954); The Tangled Seine: A Survey of Maritime Personal Injury Remedies, 57 Yale L.J. 243, 252 (1947); Gilmore and Black, The Law of Admiralty, 315-324, 358 (1957)
 
 
 [2]
 Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; Pope & Talbot, Inc., v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143; Petterson v. Alaska S.S. Co., 9 Cir., 1953, 205 F.2d 478, affirmed per curiam 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798