**Edward T. AMATO, Libelant,**

v.

**UNITED STATES of America, Bethlehem Steel Company and Overseas Tankship Corp., Respondents,**
and
**Bethlehem Steel Company, Respondent-Impleaded.**

United States District Court
S. D. New York.

Nov. 26, 1958.

Jacob Rassner, New York City, for libelant. Warren Small, Elmont, of counsel.

Arthur H. Christy, U. S. Atty., New York City, for respondents, the United States and Overseas Tankship Corp. by Dorsey, Burke & Keber, New York City, Morgan J. Burke, James F. Hart, New York City, of counsel.

Galli & Locker, New York City, for Bethlehem Steel Co., Raymond J. Scully, Larchmont, of counsel.

FREDERICK van PELT BRYAN, District Judge.

This is a suit in admiralty for personal injuries sustained by libelant aboard the S. S. Seneca Castle against the respondents United States and Overseas as alleged owners of the vessel, and respondent Bethlehem which was reconverting the vessel in its Hoboken yard under contract with the United States. Libelant proceeds against the alleged owners on the theories of negligence and of unseaworthiness and against Bethlehem on the theory of negligence. The case has been tried before me without a jury and the facts as they appeared on the trial I find to be as follows:

The accident occurred on April 14, 1947. The Seneca Castle, a Victory ship then owned by the United States, was moored at dockside in the Bethlehem Shipyards in Hoboken, New Jersey, pursuant to a lump sum contract with the United States involving this and a number of other ships. She was being completely overhauled, renovated and reconverted into a tanker by Bethlehem at a cost of $153,371, preparatory to her transfer to respondent Overseas, her new

owner. It appeared during the trial that the transfer of title to Overseas did not take place until April 17, 1947, three days after the accident, and the libel was therefore dismissed as to this respondent, with libelant's consent.

The United States had turned over control of the vessel to Bethlehem some time in March. All of her steam and power were off and none of her crew were aboard except a standby crew consisting of a mate, two assistant engineers and three crew members whose functions were to keep the ship dry and afloat.

Libelant Amato was an experienced marine painter employed by Union Engineering Corporation, a sub-contractor of Bethlehem, under its contract with the Government for reconstruction of the vessel. On the day of the accident he was painting kingposts on the Seneca Castle. About three o'clock in the afternoon Amato, having finished painting one of the kingposts, proceeded aft along the port deck of the vessel to commence painting the next, which was about 40 or 50 feet aft of where he had been working. He carried with him his boatswain's chair, rope, paint pot and brushes.

There was a steam jenny or boiler on the deck against the port rail which extended several feet inboard from the rail. Leading from the jenny was a metal pipe some 2½ inches in diameter which ran at right angles to the median line of the vessel across the deck to a hatch. The pipe, which was hot, was raised a couple of inches above the deck, leaving a space between the bottom of the pipe and the deck. The top of the pipe was thus about five inches from the deck surface. There is no evidence indicating there were any other obstructions on this stretch of deck.

The jenny and pipe were not gear or appurtenances of the ship but had been placed aboard her by Bethlehem to supply necessary steam for the work being performed. In fact, Bethlehem charged the Government some $3,000 for this installation as part of the cost of the job. There were no warning signs or guards at or near the pipe. Nor were there any

steps or ramp over the pipe for persons proceeding along the deck to use. There is evidence, however, that precautions of the latter nature had been taken in other instances, though there is not sufficient to show that this was customary.

A great deal of work was going on all over the ship. As Amato proceeded down the deck he heard a warning shout, "Look out overhead", "Heads up" or similar words. He immediately looked above him and saw a steel beam in close proximity being hoisted on a cable. In an attempt to avoid this danger he moved to his left practically involuntarily, more or less in the direction in which he had been going. As he did so, his foot caught under the pipe and he tripped and fell over it, injuring his left knee and burning his hand. He immediately reported the accident to his foreman.

Libelant charges (1) that the accident was caused by the unseaworthiness of the vessel and its appurtenances and that therefore respondent United States is liable to him; (2) that the accident was also caused by the negligence of the respondent United States and respondent Bethlehem in maintaining or permitting the maintenance of the pipe over which he fell in that posture and condition, and in failing to provide him with a safe place to work, and that therefore both are liable to him in negligence; and (3) that in any event, the respondent Bethlehem was guilty of negligence in installing the pipe in this condition and in failing to provide him a safe place to work irrespective of any liability to him of the Government as the ship's owner.

The respondent United States maintains that, since the vessel was in the Bethlehem Yard under the complete control of Bethlehem for purposes of reconstruction, and the gear which caused the accident was not part of the ship's gear but had been installed by Bethlehem, there is no proof of unseaworthiness and there can be no recovery against it on that ground. It denies that there was any negligence and asserts that even if there were negligence, it was not on its part but on the part of Bethlehem

which placed the installation aboard which caused the accident.

Finally, it asserts that even were it liable either for negligence or unseaworthiness or both, it is entitled to judgment of indemnity over as against Bethlehem, both because it was merely a passive actor and the affirmative acts which caused the accident were committed by Bethlehem and because, in any event, Bethlehem is liable to indemnify it because of an indemnity clause in the lump sum contract with the Government.

Bethlehem denies it was guilty of any negligence and asserts that the pipe in the position and condition it was at the time of the accident did not constitute a hazard and that it was not guilty of any negligence. Both respondents assert that in any event the plaintiff was guilty of contributory negligence, and that his own negligence was in fact the cause of the accident.

■ It is well settled that the libelant, as an employee of the subcontractor, working on the vessel was a "business guest" or "invitee". There was a duty to provide him with a safe place to work, both on the part of Bethlehem as the general contractor who was doing the work, and on the part of the United States as the owner of the vessel. Guerrini v. United States, 2 Cir., 167 F.2d 352; LaGuerra v. Brasileiro, 2 Cir., 124 F.2d 553; Cannella v. Lykes Bros. S. S. Co., 2 Cir., 174 F.2d 794; Brabazon v. Belships Co., 3 Cir., 202 F.2d 904; Grillo v. Royal Norwegian Government, 2 Cir., 139 F.2d 237.

■ I find that the libelant's accident occurred as a result of negligence and that the negligence was the proximate cause of his accident and injury. The presence of the steam pipe raised some five inches above the otherwise unobstructed deck, and with a space beneath which could catch the foot, was a source of danger to those working on the vessel. This was particularly true in view of the possibility of the hazards such as that encountered by the libelant immediately before the accident which were bound to arise out of the extensive work being carried on. It was this hazard which resulted in his foot being caught in this "trap" and caused the accident.

There were plainly precautions which could have been taken by way of ramps or similar devices over the pipe which would have minimized, or perhaps even eliminated, the danger. There was evidence that such devices were in use in similar situations, which bears on the question of their availability or the possibility of their use, though it was not established that they were customary.

I also find that the accident was not caused in whole or in part by the contributory negligence of the libelant. There is little doubt that in the absence of some untoward incident, such an accident as occurred could scarcely have happened without at least some absence of due care on the part of the libelant for his own safety. Here, however, the testimony is uncontradicted that as the libelant approached the pipe, there was a shouted warning of potential danger overhead which the libelant under the circumstances was plainly required to take seriously. He immediately looked up, as he should have done, and saw a menacing beam overhead. In an effort to avoid this apparent danger, he moved almost involuntarily in the direction on the deck which he might reasonably have expected to be free from a trap of this character. In the course of this movement he caught his foot in the trap and it was this that caused his fall. There was no failure of the libelant under these circumstances to take reasonable precautions for his own safety or to anticipate or avoid the danger presented by this obstruction.

It is quite plain that the primary and active negligence here was that of the respondent Bethlehem. The jenny and steam pipe were placed on the deck in this very manner by Bethlehem without taking any precautions to avoid or minimize the danger which such an installation at this place and under these circumstances presented, or to warn of any

such danger. Bethlehem is clearly liable for the consequences of such negligence and of not providing libelant with a safe place to work.

■ The question of whether the United States is liable, either for negligence or unseaworthiness, is, however, a more difficult one. In view of my finding that Bethlehem was negligent, it is perhaps not of too much importance to the libelant since he has a recovery anyway. Nor, perhaps, does it seriously affect the ultimate responsibility of the United States. As has been pointed out, the primary negligence here was that of Bethlehem since it created the condition which caused the accident. The negligence of the United States, was merely passive. As the actively negligent tort feasor, Bethlehem is primarily responsible for its negligent act not only to the libelant but also to the United States, which is indirectly harmed by being cast in damages for Bethlehem's wrongful act. Palazzo v. Pan-Atlantic S. S. Corp., 2 Cir., 211 F.2d 277, affirmed sub nom Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp., 250 U.S. 124, 76 S. Ct. 232, 100 L.Ed. 133; McFall v. Compagnie Maritime Belge, 304 N.Y. 314, 327, 107 N.E.2d 463.[1]

■ However in any event, it is clear that Bethlehem is liable over to the United States by virtue of the express indemnity provision of the overall lump sum contract between Bethlehem and the United States.[2] A/S J. Ludwig Mowinckels Rederi v. Commercial Stevedoring, Inc., 2 Cir., 256 F.2d 227.

The question of whether the United States is liable in negligence or for unseaworthiness is not one which can be avoided.

■ The United States, as the owner of the vessel, plainly owed a non-delegable duty to "business guests" such as the libelant, to provide them with a safe place to work. The extent of that duty, however, is largely determined by the facts and circumstances, including the nature of the work to be done, the degree of control relinquished by the owner to a responsible contractor, and the knowledge or the reasonable possibility of acquiring knowledge of an unsafe condition.

Clearly under such circumstances as these the owner could scarcely be expected to anticipate or prevent every hazard which arose in the course of the work. To impose such a requirement would make him, for all practical purposes, an insurer against the negligence of the contractor, and the owner's duty certainly does not yet go that far.

■ Thus, acts of negligence by the contractor's agents which would not be reasonably expected to come to the attention of the owner in the exercise of reasonable care, are not part of the owner's

1. It should be noted, however, that where a contract of indemnity is involved recent authority suggests that the so-called "active"-"passive" distinction is irrelevant. Weyerhaeuser S.S. Co. v. Nacirema Operating Co., 355 U.S. 563, 78 S. Ct. 438, 2 L.Ed.2d 491. Therefore, my finding as to the type of negligence of which the respective parties were guilty is for purposes of the record.

2. Paragraph 12 of the contract provided:
*Indemnity and Insurance.*
(a) The Contractor shall exercise reasonable care and use its best efforts to prevent accidents, injury or damage to all employees, persons and property in and about the work, and to the vessel or portion thereof upon which work is done.

(b) The Contractor does indemnify and hold harmless the Administrator, the United States, its agencies and instrumentalities, the vessel and its owner, against all suits, actions, claims, costs or demands (including, without limitation, suits, actions, claims, costs or demands for death, personal injury, and property damage) to which the United States, its agencies and instrumentalities, the vessel or its owner may be subject or put by reason of damage or injury (including death) to the property or person of any one other than the United States, its agencies and instrumentalities, the vessel or its owner, arising or resulting from the fault, negligence, wrongful act or omission of the Contractor, of any subcontractor, its or their servants, agents or employees.

responsibility, whether or not they result in unsafe conditions of a relatively temporary nature or in some far distant or obscure part of the ship. See McFall v. Companie Maritime Belge, 304 N.Y. 314, 107 N.E.2d 463.

If, however, the condition is open and notorious and of relatively long standing, the owner has the duty of supervising what the contractor does to the extent, at least, of preventing or correcting such dangers.

■ Here the jenny and pipe was the installation which provided motive power for the whole operation. It was placed in a conspicuous position on the deck and had been there for at least two days prior to the occurrence, and probably since the early part of the work. The United States had kept a skeleton crew aboard the vessel with a responsible officer, the mate, in charge. True, their duties apparently were to keep the ship dry and afloat. But this did not relieve them from responsibility as agents of the owner of observing and correcting this open and apparent danger.

Under these circumstances I find that the United States, as the owner of the vessel, breached its non-delegable duty to the libelant to provide him with a safe place to work, and is therefore liable to him in negligence.

■ The question of the liability of the United States for unseaworthiness, however, is a different matter. The same facts which established negligence on the part of the United States would be sufficient to establish this as an unseaworthy condition. This would be true whether or not the appurtenance in question was a part of the gear and appurtenances of the ship. The doctrine applies even though the appurtenance which was unseaworthy was brought aboard or installed by the contractor in connection with and as part of the equipment he required to do the job. Alaska Steamship Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798.

■ However, because this device may have been in an unseaworthy condition is not to say that the owner's warranty against unseaworthiness applies to this libelant. Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; Pope & Talbot v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143; Alaska S. S. Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601; Halecki v. United New York & New Jersey S. H. P. Ass'n, 2 Cir., 251 F.2d 708, 711, certiorari granted 357 U.S. 903, 78 S.Ct. 1149, 2 L.Ed.2d 1154; Berge v. National Bulk Carriers Corp., 2 Cir., 251 F.2d 717, certiorari denied 356 U.S. 958, 78 S.Ct. 994, 2 L.Ed.2d 1066.

■ All these cases make it abundantly clear that the warranty of seaworthiness may extend not only to seamen and longshoremen, but even to persons employed by an independent contractor working on the ship, under some circumstances. The test as to whether it does so extend, as stated by Judge Learned Hand in the Halecki case, is

"whether the work is of a kind that traditionally the crew has been accustomed to do, and as to that it makes no difference that the means employed have changed with time, or whether defective apparatus was brought aboard and was not part of the ship's own gear."

However, as Judge Hand pointed out in the companion Berge case:

"Obviously there must be some limit, else the whole fabrication of a new ship would be included. We can only say that the reconstruction of a ship was not traditionally the task of the crew. Berryhill v. Pacific Far East Line, 9 Cir., 238 F.2d 385, certiorari denied 354 U.S. 938, 77 S.Ct. 1400, 1 L.Ed.2d 1537." [251 F.2d 718.]

■ The libelant contends that he was engaged in painting the ship and that painting was part of the work customarily done by the crew, and that therefore the warranty of seaworthiness must extend to him also under the holding of these cases. I do not agree. It is plain here, as in Berge, that the work being performed by Bethlehem amounted to a

virtual rebuilding of the interior and much of the upper works of the vessel. The argument of the libelant turns on the interpretation to be given to the word "work" as it is used in the opinions in Halecki and Berge.

As I view it, the "work" which libelant was performing was a part of the work of complete overhaul, renovation and reconversion of the ship. This work was not traditionally work performed by the crew, as Judge Hand pointed out in Berge.

To hold otherwise would lead to very strange results. It would mean that in every case of reconstruction or reconversion or rebuilding, there would have to be a job analysis to determine whether any particular part of the reconstruction process consisted of work which the crew was accustomed to perform. The determination of liability would depend on the merely fortuitous circumstance of whether the libelant's work on an overall reconstruction job was by pure accident, crew work or something other than crew work.

This would introduce into this already confused field of liability, a whole body of speculative elements which would deny recovery to one worker engaged in the reconstruction project and permit recovery for another who was standing next to him, merely by the accident of his trade or craft. Indeed, the result might well follow that of two men injured in the same accident, one might be denied recovery upon such a theory and the other granted recovery, though they are both working on the same reconstruction job. This is the converse of the situation which was viewed with some apprehension by Mr. Justice Black in Pope & Talbot, Inc. v. Hawn, 346 U. S. 406, 413, 74 S.Ct. 202, 207, where he said:

"* * * The ship on which Hawn was hurt was being loaded when the grain loading equipment developed a slight defect. Hawn was put to work on it so that the loading could go on at once. There he was hurt. His need for protection from unseaworthiness was neither more nor less than that of the stevedores then working with him on the ship or of seamen who had been or were about to go on a voyage. All were subjected to the same danger. All were entitled to like treatment under law."

Such resulting inequality would seem to me to be carrying the doctrine of Seas Shipping Co. v. Sieracki, supra, and the cases following it, almost to an absurdity.

 There remains the question of damages. Libelant claims to have suffered an injury to his left knee with long standing and to some extent permanent consequences and burns on his hands. Little emphasis was laid on the burns, however, in the testimony.

The libelant was treated by a compensation doctor the day after the accident who diagnosed a sprain of the left leg, and he was then away from work for two or three days. He returned to work and continued at work regularly until June 29, 1947, when he was laid off by his employer.

On July 19, 1947, his knee "locked" and he consulted an orthopedist who placed him in the hospital where he remained until August 9th. His left leg was in traction for some ten days and an operation was then performed for the removal of the semilunar cartilage in the knee which was found to have been torn or fractured. He continued to be treated by his physician until September, 1947, and then was discharged as able to do light work. It was the view of the treating physician that there was a residual weakness in the knee which prevented him from resuming his somewhat arduous work as a marine painter.

Libelant testified that he was unable to get light work and did not go back to work until September, 1948, a year later, when he took permanent employment with the Fifth Avenue Omnibus Company.

However, I am not persuaded that the libelant could not have obtained light work for at least the latter half of that

period, or that he made any very earnest or diligent effort to do so.

For the past ten years libelant has worked as an oiler for the bus company on a permanent basis. In 1949 he had a similar operation for the removal of a similar cartilage from his right knee which had nothing to do with the present accident. His earnings as a marine painter had averaged $5,000 a year prior to the accident. His earnings as an oiler with the bus company have averaged considerably less. However, marine painters get their jobs on shapeup and the amount of their earnings is speculative and depends in large measure on the well-known ups and downs of the shipping business.

The job which plaintiff now holds has the advantage of being relatively steady and secure. It cannot be said overall that any very substantial losses have occurred to the libelant by taking that job instead of continuing as a marine painter. Such difficulty and weakness as libelant now experiences in his left leg has not prevented him from working as an oiler and is contributed to by the wholly unrelated operation on his right leg which affects both.

Under the circumstances I find that the sum of $10,000 will adequately compensate libelant for the consequences of his accident. Judgment will therefore be rendered in favor of libelant and against the respondents Bethlehem and the United States, in the sum of $10,000, and judgment over by way of indemnity in the same amount will be given in favor of respondent United States and against respondent Bethlehem.

The United States is not, however, limited by the recovery of the libelant in the computation of its recovery over against Bethlehem. In addition to the sum of $10,000 the United States is entitled to recover its "reasonable attorneys' fees, costs and expenses in defending against * * * [libelant's] claim." A/S J. Ludwig Mowinckels Rederi v. Commercial Stevedoring, Inc., 2 Cir., 256 F.2d 227, 232. Counsel for the United

States have submitted an itemized statement of their services and expenses in this litigation. Both parties have left the question of the fairness and reasonableness of the amounts to be awarded for counsel fees and expenses entirely to the court. Considering all the circumstances I find the sum of $1,750 as counsel fees and $1,250 as the proportionate share of out of pocket disbursements allocable to this branch of the case, or a total of $3,000, to be fair and reasonable. The judgment over to be entered in favor of the United States and against Bethlehem will include this item.

Judgment will be entered accordingly.