Howard **CHAMBERLAIN**, Libelant,

v.

**SHAVER TRANSPORTATION COMPA-NY, an Oregon corporation, and SHAV-ER TRANSPORTATION BARGE NO. 21, its engine, cargo and equipment, Respondents.**

**Civ. No. 66-73.**

United States District Court
D. Oregon.

Sept. 9, 1966.

Supplemental Opinion Jan. 13, 1967.

Burl L. Green and Allen T. Murphy, Jr., Green, Richardson, Griswold & Murphy, Portland, Or., for libelant.

Kenneth E. Roberts, Mautz, Souther, Spaulding, Kinsey & Williamson, Portland, Or., for respondents.

## OPINION

KILKENNY, District Judge:

Libelant, Howard Chamberlain, was employed as a mechanic for Shaver Transportation Company (Shaver), an Oregon corporation engaged primarily in inland waterway transportation in the vicinity of Portland. His normal place of duty was at Shaver's machine shop, a converted Landing Ship Medium (LSM), afloat at the company's Portland moorage. Libelant's duties included repairing fuel pumps, diesel engines, and hydraulic engines, and he was considered an expert on repairing small diesel engines. Although most of his work was done at the machine shop, he and other mechanics would often be sent aboard Shaver vessels when trouble developed which could not be handled by the normal crews.

On March 25, 1965, one of Shaver's barges was moved by a Shaver tug to a shore installation on the north side of the Columbia River, so that oil could be discharged to shore side. The power for this unloading came from a diesel engine on board the barge which, in turn, operated the pump discharging the oil. During the process of unloading, the diesel engine overheated and the tug's crew,[1] a captain and a deck hand, attempted to remedy the situation by shutting off the engine for short periods and adding fresh water to its radiator. This was to no avail, so the captain called Shaver's shoreside operation for aid. Libelant Chamberlain was then sent to the barge. He found that the engine was in need of fuel, and the engine's tank was then filled. After the engine was started, the captain asked libelant to enter the engine room to check the gauges, and it was then that he was injured.

The makeup of the engine room was such that one had to lean over a rapidly spinning (1,700 R.P.M.) shaft, which was only partially covered by a protective shield and from which a head screw protruded, in order to check the engine's gauges. There was no operational lighting system in the room, which was dark enough that libelant found it necessary to use a flashlight. In addition, there was a strong current of air existent, produced by a fan connected to the engine which was driving the shaft.

As libelant was checking the gauges, the air current blew his clothing under the shaft guard and into the shaft. The clothing was then caught on the head screw protruding from the shaft, and wrapped around it, pulling him into the shaft. The shield which served as a partial guard to the shaft tore off, and libelant was severely injured, suffering near total incapacity.[2]

At the close of the trial, I stated my belief that libelant was injured by the unseaworthiness of the barge.

## ISSUES

The principal issues to be decided are: (1) was the barge unseaworthy; (2) was libelant discharging duties traditionally handled by seamen at the time of his injuries; and (3) does the Longshoremen's and Harbor Workers' Compensa-

---

1. The barge itself had no crew. Its official number was ST 21–O/N 274752.

2. The injuries are alleged as follows: fractures of the bones of the right shoulder; fractures and dislocations of the vertebrae of the middle back, resulting in permanent injuries to the spinal cord and permanent paralysis from the waist down; loss of control over bladder and bowels; lacerations of arms, shoulders and chest; the tearing, twisting, and crushing of bones, ligaments, tendons, soft tissue, muscles and nerves of his chest and arms and other parts of his body, all of a permanent nature. Resulting general damages are asked for in the sum of $489,-000.00, and special damages, because of loss of wages, are asked for in the sum of $8,000.00.

tion Act protect respondents from liability for the unseaworthiness of the barge?

## UNSEAWORTHY CONDITION OF THE BARGE

Since the case of Mahnich v. Southern S. S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944), there has been no doubt that a shipowner is under an absolute duty to furnish a seaworthy ship. The essence of the doctrine of unseaworthiness was recently stated by the Supreme Court in Gutierrez v. Waterman S. S. Corp., 373 U.S. 206, 213, 83 S.Ct. 1185, 1190, 10 L.Ed.2d 297 (1963) to be that:

> " * * * things about a ship, whether the hull, the decks, the machinery, the tools furnished, the stowage, or the cargo containers, must be reasonably fit for the purpose for which they are to be used. * * * "

The traditionally hazardous conditions which exist in the maritime industry, together with the historically weak position[3] of seamen, have resulted in the doctrine becoming absolute and nondelegable. Unseaworthiness' scope has greatly enlarged of late. It can, of course, come about because of a defect in the ship, its appliances, or its machinery,[4] but defective equipment brought on board ship by an independent contractor has also sustained a claim,[5] as has, under certain circumstances, a severe beating by a fellow crew member.[6]

In this case, it is quite obvious that the authorities support my finding of unseaworthiness.

The uncontroverted evidence in this case is that the shaft, with its protruding screw, was moving rapidly and that it was only partially guarded. I previously held, and I now find, that the injuries would not have occurred if the shaft had been completely covered by a protective shield, nor would libelant be injured if the screw in question had not protruded. Additionally, the light in the area was quite inadequate.

Petterson v. Alaska S. S. Co., supra, footnote 5; The Seeandbee, 102 F.2d 577 (6th Cir.1939); Pacific Far East Lines v. Williams, 234 F.2d 378 (9th Cir.1956), cert. denied 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76 (1956); Gutierrez v. Waterman S. S. Corp., supra, are in full support of these findings.

I find that the barge was unseaworthy in each of the following respects:

(a) that the shaft running from the engine to the petroleum pump was only partially covered with a guard;

(b) that the aforesaid shaft and its shaft coupling, had keys, pins and headscrews protruding therefrom;

(c) that the gauges on the engine were so positioned that a crew member was required to lean over the shaft and shaft coupling in order to read them;

(d) that the fan of said engine blew a strong current of air back around the engine and over the shaft and shaft coupling;

(e) that the electric lights in the engine room were not functioning.

---

3. The attitude of the courts on this matter is epitomized by Justice Storey's remarks in Harden v. Gordon, 11 Fed.Cas. p. 480 (No. 6,047) (C.D.D.Me.1823). He said, in part: "Every court should watch with jealousy an encroachment upon the rights of seamen, because they are unprotected and need counsel * * *. They are emphatically the wards of admiralty".

4. See, e. g., Halecki v. United N.Y. & N.J. Sandy Hook Pilots Ass'n., 251 F.2d 708 (2d Cir. 1958).

5. Petterson v. Alaska S.S. Co., 205 F.2d 478 (9th Cir. 1953), aff'd. per curiam, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954).

6. Boudoin v. Lykes Bros. S.S. Co., 348 U.S. 336, 75 S.Ct. 382, 99 L.Ed. 354 (1955).

And that each of said specifications was a proximate cause of libelant's injuries.

## WAS LIBELANT DISCHARGING TRADITIONAL SEAMEN'S DUTIES

In 1946, the Supreme Court in Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), extended to longshoremen *and others* "within the range of its humanitarian policy," the doctrine of unseaworthiness. Some twenty years prior to that time, the Supreme Court permitted a longshoreman to recover under the Jones Act,[7] when he was performing a maritime service formerly rendered by the ship's crew.[8]

 Shaver, until recently, had aboard its tugs what it termed "marine engineers" who, in fact, were shipwrights and mechanics. Their duties encompassed inspection, maintenance and repair of the marine engines aboard the barges, together with the engines aboard the vessels or tugs. Modernization and competition compelled Shaver to gradually make changes so that the engines were operated from the wheelhouse or control tower. As a result, the marine engineers were no longer carried on board the tugs. Shaver, like other companies, sent marine engineers, like libelant, aboard the tugs and barges from shoreside facilities for the purpose of properly maintaining and repairing engines. The barge in question was unloading oil at the time the engine trouble developed. The tug's crew did not have the expertise with which to solve the problem. I am of the belief that the unloading of the barge and the maintenance and repair of the engine were both traditional duties of a seaman. Seas Shipping Co. v. Sieracki, supra; Ryan Stevedoring Co., Inc. v. Pan-At-

lantic S. S. Corp., 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956); The Tungass v. Skovgaard, 358 U.S. 588, 79 S. Ct. 503, 3 L.Ed.2d 524 (1959); Capadona v. The Lake Atlin et al., 101 F.Supp. 851 (S.D.Cal.1951) and Pope & Talbot, Inc. v. Hawn, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953) support this view. I find that libelant was, at the time of his injuries, engaged in duties which were traditionally discharged by seamen. Pope & Talbot v. Hawn, supra, is of importance in that the plaintiff was not a stevedore. Hawn was aboard the vessel in connection with the repair of the loading equipment, while here, the libelant was aboard the barge in connection with the repair of unloading equipment.

## DOES THE LONGSHOREMEN'S AND HARBOR WORKERS' COMPENSATION ACT[9] PROTECT THE RESPONDENTS

Section 5 of the Act[10] provides, in pertinent part, as follows:

"The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to recover damages from such employer at law or in admiralty on account of such injury or death, * *."

If this was a matter of first impression, I could well find that respondents, as the employer of libelant, and being covered by the Act, should be protected. Be that as it may, the Supreme Court in Seas Shipping Co. v. Sieracki, supra, held that the traditional warranty of seaworthiness extended to longshoremen performing the duties of seamen, and that such persons could recover against the vessel owner for the unseaworthi-

---

7. 46 U.S.C. § 688.

8. International Stevedoring Co. v. Haverty, 272 U.S. 50, 47 S.Ct. 19, 71 L.Ed. 157 (1926).

9. 33 U.S.C. §§ 901–950.

10. 33 U.S.C. § 905.

# 52

ness of the vessel, despite the prohibition of the Act. Later the Supreme Court extended the doctrine of unseaworthiness to a repairman, such as Hawn in *Pope & Talbot*, and held that he was entitled to the same treatment as the longshoreman in *Sieracki*.

■ True enough, Hawn was not employed by the owner of the vessel, but by an independent company, hired for the purpose of making repairs. This distinction might be of value if it was not for the subsequent decision of the Supreme Court in Reed v. The Yaka, 373 U.S. 410, 83 S.Ct. 1349, 10 L.Ed.2d 448 (1963). There, a longshoreman filed an action *in rem* against the ship on which he was injured. He was an employee of the corporation operating the vessel under a bareboat charter. It was there urged that libelant could not recover for the reason that his employer was covered by the Act and thus exempted from liability. The Supreme Court held that the corporation was a shipowner *pro hac vice*, and as such, was liable for the unseaworthiness of the vessel. Respondents' attempt to distinguish *The Yaka* from the case at hand is on thin ice. They argue that here the respondent is the employer-owner, while in *The Yaka*, the corporation was the employer-owner *pro hac vice*. Certain language in the *Yaka* decision destroys this distinction.[11] Manifestly, there is no distinction between the liability, on issues such as are here presented, between a shipowner and a shipowner *pro hac vice*. That being so, my decision must be controlled by *Yaka*. The recent case of Biggs v. Norfolk Dredging Co., 360 F.2d 360 (4th Cir. 1966), recognizes the views here expressed. Consequently, respondents are not protected by 33 U.S.C. § 905. Of considerable academic importance is the interesting and amusing article, "Sub-

stance Over Form In Reed v. The S. S. Yaka," 2 Houst.L.Rev. 17 (1964).

Respondents' argument that the doctrine of unseaworthiness was extended to longshoremen, due to the occupational hardships of that profession, may be sound. But that doesn't mean that a person performing duties traditionally performed by seamen, be he a marine engineer, such as libelant, or otherwise, should not be accorded the same treatment. Recent decisions of the Supreme Court place emphasis on the danger of being injured because of conditions aboard ship, rather than on hiring conditions or the perils of the sea. *Sieracki* and *Yaka* are examples.

■ I find that libelant was negligent in a manner proximately contributing to his injuries in failing to keep a proper lookout for his own safety and that such negligence amounted to 25% of the cause of his injuries.

This opinion shall serve as my findings and conclusions on the issues mentioned. Reserved for decision are the following issues: (1) are respondents entitled to claim the benefit of limitation of liability statutes of the United States and, if so, what is the value of the vessel or vessels involved; (2) the amount of libelant's damages, as reduced by his contributory negligence.

The subject is placed on my call calendar for September 19, 1966, at 9:00 o'clock A.M., at which time counsel should advise as to approximate trial time on the remaining issues.

### SUPPLEMENTAL OPINION.

KILKENNY, District Judge:

I have for decision the amount of damages, general and special, which should be allowed to libelant.

---

11. "Under such arrangements [a bareboat charter] full possession and control of the vessel are delivered up to the charterer for a period of time. The ship is then directed by its Master and manned by his crew; it makes his voyages and carries the cargo he chooses. Services performed on board the ship are principally for his benefit. *It has long been recognized in the law of admiralty that for many, if not most, purposes the bareboat charter is to be treated as the owner * * *.*" (373 U.S. at p. 412, 83 S.Ct. at p. 1351) (Emphasis supplied.)

In almost forty years on the Bench and at the Bar, libelant presents by far the most serious personal injuries which I have had occasion to observe or analyze. Libelant, as a result of the accident, is a paraplegic for life and sustained the personal injuries as he has charged.

### SPECIAL DAMAGES

█ His take home pay at the time of the accident was approximately $7,000.00. I award him $12,750.00 as special damages for loss of wages to this date. On the authority of Grace Line, Inc. v. Kanton (9th Cir., September 8, 1966), 366 F.2d 510, cert. denied 385 U.S. ——, 87 S.Ct. 720, 17 L.Ed.2d 548 (January, 1967), I will deduct the sum of $6,948.00, plus such additional sums as may have been paid as compensation since the time of the trial and award libelant judgment for the balance.

█ I find that the medical expense to the date of the trial was $28,967.47, and that such sum was reasonable. However, on the authority of the *Kanton* case, I decline to permit libelant a recovery of such expenses. Here, as in *Kanton*, the respondent was the one who provided the insurance which paid compensation to the libelant and has been paying his doctor, hospital and other medical expenses.

### GENERAL DAMAGES

Libelant's life expectancy at the time of the trial was ten years and I so find. Of course, this expectancy was far less than it was at the time of the accident.

█ (1) *Future Nursing Care*. At the present time, the libelant is expending approximately $5,000.00 per year for nursing care. I am of the belief that this will level out at a lower sum and that an award of $32,000.00 at this time, properly invested, would be sufficient to compensate for nursing care in the future.

█ (2) *Future Lost Earnings*. Although the company, by whom libelant was employed, had no fixed date for retirement, it is a fact that most laborers attempt to retire at 65 years of age and on this item it seems to me that an award from December, 1966, to December, 1973, when plaintiff would be 65 years of age, is proper. His average net earnings for the past five years were in the neighborhood of $6,200.00 and that would appear to be a proper basis on which to make an award for future lost earnings until the plaintiff would reach the age of 65. I find that a present fund of $35,000.00, properly invested, is adequate to compensate for lost future earnings to age 65 and that an additional $10,000.00 is reasonable for all other lost future earnings, making a total of $45,000.00.

(3) *Hospitalization*. The evidence supports a finding that $7,500.00, properly invested, would be sufficient to take care of all future hospitalization of libelant, including the terminal hospital cost.

█ (4) *Injuries, Pain and Suffering, Physical and Mental, Past, Present and Future*. I have no hesitancy in finding that $200,000.00 is a reasonable sum to be allowed for these items, and I so find. I shall not go into detail on the evidence presented, but it certainly supports a finding in that amount. Libelant was in good health at the time of his injuries and had a life expectancy of approximately 20 years. That expectancy has been reduced, by the injuries, to approximately 10 years.

(5) *Miscellaneous, including drugs, appliances, doctor bills, etc.* The evidence justifies an award of $10,000.00, which, if properly invested, should be sufficient to take care of these miscellaneous items, and I so find.

(6) The total amount of the award should be reduced by 25%, my evaluation of libelant's contributory negligence.

(7) The indicated total award is $300,302.00. This is to be reduced by $75,075.50, leaving a balance of $225,226.50, the indicated amount of the judgment. This sum is to be reduced by recent compensation payments above the $6,948.00, previously mentioned.

Findings and decree in conformity with this and the original opinion shall be prepared, served and presented by counsel for libelant.